FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

SEP 19 2006

GREGORY C. LANGHAM
CLERK

UNITED STATES OF AMERICA,

      Plaintiff, Appellee,             Appeal No. 06-cr-282-WDM

v.                            On Appeal from Judgment
                              of the US Magistrate:
SCOTT SOWKA                Criminal Case No: F4067046

      Defendant, Appellant.

---

# Opening Brief of Appellant

---

## TABLE OF CONTENTS

1. Summary of the Case ................................................................................ 1
2. Jurisdiction and Standard of Review ...................................................... 2
3. Examination and Refutation of the Magistrate's Ruling ........................ 3
4. Establishment of the Appellant's Religious Beliefs ............................... 8
5. Examination of Certain Beliefs Pertinent to this Case.......................... 12
6. Burdens to Belief Posed by 36 CFR 251.54 .......................................... 15
7. Interests Allegedly Served by 36 CFR 251.54....................................... 17
8. Means Less restrictive than 36 CFR 251.54 ......................................... 18
9. Burdens to Belief Posed by 36 CFR 261.10(k)....................................... 19
10. Interests Allegedly Served by 36 CFR 261.10(k)................................. 21
11. Means Less restrictive than 36 CFR 261.10(k) .................................. 22
12. Closing Statements............................................................................... 23
13. Internal Procedures for Citing Evidence and Testimony.................... 26

## 1. SUMMARY OF THE CASE

      On July 01, 2006, while attending the annual Gathering of the Rainbow Family of

Living Light (RFLL) in the Routt National Forest, the Appellant was issued violation

number F4067046, directing him to appear at a temporary courthouse created near the

site, where the Appellant was charged with violation of 36 CFR 261.10(k), use or

Appeal No.
06-cr-282-WDM
        Opening Brief
        of Appellant
        Page 1 of 27

occupancy of National Forest lands without a permit. Matters were taken to Magistrate trial on 7/7/06, and the Appellant guilty based on the government's proof of the facts pursuant to UNITED STATES v. JOHNSON, 988 F. Supp. 920 (1997); i.e. *"(1) use, (2) of National Forest land, (3) by a non-commercial group of 75 or more persons, either as participants or spectators, (4) without special use authorization."*.

This appeal challenges the Johnson test as overbroad in determining what personal religious conduct may be construed as criminal activity and insufficient for the return of a guilty verdict. Further, it argues that the permit requirement under 36 CFR 251.54 and the resulting enforcement of 36 CFR 261.10(k) are inappropriate as applied to attendees at a public, religious assembly: serving no compelling government interest while substantially burdening Appellant's spiritual pilgrimage and prayer constituting a violation of the Religious Freedom Restoration Act of 1993 (RFRA).

## 2. JURISDICTION AND STANDARD OF REVIEW

The District Court has jurisdiction in this appeal pursuant to 18 U.S.C. §3402, which provides for an appeal of right in the District Court where the offense was alleged, in all cases of misdemeanor conviction by a United States Magistrate. The scope of the appeal is the same as an appeal of judgment from a District Court to a Court of Appeals, and the record before the Magistrate Judge will be reviewed. See e.g., *United States v. Van Fossan*, 899-F.2d 636, 637 - 38 (7th Cir. 1990). Such cases raising issues of construction of federal regulations and constitutional challenges to the judgment of conviction are subject to standards of *de novo* review, as with District Court judgments brought before a Courts of Appeals. Fed.R.Crim.P. 58(g)(2)(D).

### 3. EXAMINATION AND REFUTATION OF THE MAGISTRATE'S RULING

In returning a guilty verdict, it was necessary for the magistrate to dispense with the religious use defense brought forth at trial. He did so by stating that (A) neither 36 CFR 261.10(k) or 251.54 constitute a substantial burden on the defendant's exercise of religious freedom (169:40); (B) the government reasonably applied discretion in refusing a permit due to fire danger in the area of the gathering (169:58);  (C) neither 36 CFR 261.10(k) nor 251.54 were selectively enforced (170:15);  (D) there is a legitimate interest in mitigating damage to forest land, due to the number of attendees present (170:31);  (E) that the introduction of a RFRA defense by the Appellant constitutes a First Amendment facial challenge to the regulations (169:12), a matter which has been examined by the courts, at length, in three cited cases, to wit: US v. JOHNSON, 159 F.3d 892 (4 Cir. 1998) (*Johnson*), US v. MASEL 54 F. Supp. 2d 903, 919 (1999) (*Masel*), and US v. NENNINGER, 351 F.3d 340 (8th Cir. 2003) (*Nenninger*) (170:44). These statements are examined and challenged as follows:

(A)     *The establishment of substantial burden was*, in fact, supported by evidence and witness testimony at trial. The application of certain sections of 36 CFR 251.54 effectively required the attendees to chose between violating two different, but equally important, tenets of their faith (see section 6). The enforcement of CFR 261.10(k) attempted to prevent the defendant from practicing his religion at all and, when that failed, enforcement of the statute effectively prevented him from practicing certain aspects of said religion, both by unnecessarily and unfairly requiring his absence from religious activities and by unnecessarily fostering an environment not conducive to prayer (see section 9). The only recourse left to the defendant, to avoid prosecution, was to refrain from practicing his religion (162:26). Further, upon the

return of a guilty verdict, a sentence was imposed that will prevent the Appellant from practicing his religion for a full year (177:41). On two occasions during the course of the trial, the Magistrate sustained objections of irrelevancy that directly limited testimony admitted to demonstrate these burdens (137:24, 140:08), and on another occasion *raised* an objection of relevancy when the prosecution stated that they had none (135:17). This created an inappropriate interplay of law: allowing the prosecution to directly limit the admission of testimony along a particular line of questioning and then later citing the lack of that same information as being the sole statutory reason for the inapplicability of a defense. In this way, the magistrate ruled that information censored as irrelevant during the course of the trial was, by its omission, relevant to the outcome.

(B)    The Appellant in no way denies the existence of potential fire danger within Routt National Forest during the time of the gathering, nor that the danger created a government interest, protecting public health and safety at the gathering site, but RFRA requires more than the identification of a government interest. The only exception recognized by the statute requires the Government to satisfy the compelling interest test: to *"demonstrate that application of the burden to the person -- (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." U.S.C. §2000bb-1(b).* On June 29, 2006, the defendant hosted a Forest Service (USFS) team, who inspected fire facilities constructed in the vicinity of his camp (155:45). At that time, a permit was issued to operate said facilities in spite of a statewide fire ban (exhibit I). In lieu of this fact—that government fire experts found it sufficient to employ safety

measures less restrictive than the enforcement of an existing fire ban—it is obvious

that denial of a permit, and therefore prosecution of the defendant under CFR

261.10k—measures aberrant to the defendant's religious practices and far more

restrictive than any type of fire ban—did not represent the least restrictive method of

mitigating the risk to health and safety presented by local fire danger. It should be

noted that the fire restrictions put forth by burn permits issued to the defendant and

others in 2006 merely made official the fire-safety practices already employed by the

RFLL, regardless of the government's posted level of fire danger (exhibit 1, pgs. 6-

7). It should be noted, also, that the fire danger and resulting ban were statewide,

meaning that they would have been in effect at the three alternative sites suggested by

the USFS. This fact refutes the Magistrate's finding that discretion was properly

applied by the government in denying a permit.

(C)     The question of selective enforcement of any law against disfavored religious

practices or devotees must always be examined, but RFRA as applied in defense does

not require proof of such policies or intent: *"Congress recognized that 'laws 'neutral'*

*toward religion may burden religious exercise as surely as laws intended to interfere*

*with religious exercise,' and legislated 'the compelling interest test' as the means for*

*the courts to 'strike sensible balances between religious liberty and competing prior*

*governmental interests.' 42 U.S.C. §§ 2000bb(a)(2), (5)."* Gonzales v. O Centro

Espirita Beneficente Uniao Do Vegetal, 126 S. Ct. 1211, 1216-1217 (Feb. 21, 2006)

(*UDV*). In *UDV*, the plaintiffs successfully won a preliminary injunction against fair

and balanced enforcement of a statute that incidentally imposed a burden on their

religious practices.

(D)     While the Appellant does not deny that, when generally applied, 36 CFR 251.54

might serve a legitimate public interest in mitigating damage caused to public lands

by large groups of people, RFRA need not engage such broad testing of a questioned

statute. *"RFRA requires the Government to demonstrate that the compelling interest*

*test is satisfied through application of the challenged law 'to the person'—the*

*particular claimant whose sincere exercise of religion is being substantially*

*burdened. 42 U. S. C. §2000bb–1(b). RFRA expressly adopted the compelling interest*

*test 'as set forth in Sherbert v. Verner, 374 U. S. 398 (1963) and Wisconsin v. Yoder,*

*406 U. S. 205 (1972) .' 42 U. S. C. §2000bb(b)(1). In each of those cases, this Court*

*looked beyond broadly formulated interests justifying the general applicability of*

*government mandates and scrutinized the asserted harm of granting specific*

*exemptions to particular religious claimants, "* (*UDV*). In this sense, to prove the

legitimacy of its interest, the government would be required to prove that the RFLL,

specifically, poses a potential for significant damage to National Forest lands. The

government made no such assertion. However, the defense, in presenting testimony,

revealed the existence of "clean-up" letters issued by the USFS to the RFLL, citing

the group's history of cooperating with the USFS to mitigate resource damage

(144:49, 145:02). Many of these letters were written during years when no permit

was issued for the gathering (143:45). These same letters are summarized in

evidence (exhibit 2, pg. 4), as is a newspaper article commending clean-up efforts

(exhibit 2, pg. 3). In further support of the lack of compelling government interest in

this area is the RFLL "Mini Manual," within which are summarized general group

practices meant to minimize natural resource damage and repair damage that cannot

be avoided (exhibit 1, pgs. 3-7, 15, 18-19). Moreover, since "*the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened*" (*UDV*), in justifying the enforcement of CFR 261.10k in this case, it is the government's burden to prove that this particular defendant's presence substantially increased risks of damage; they fail to do so. The actions of the USFS, as well as the rulings of the magistrate in this case, seem to suggest they believe the opposite to be true. The issuance of a burn permit to the defendant prior to his subsequent ticketing indicates that at least one branch of the USFS thought the defendant's presence lessened the risk of potential damage. Similarly, in granting the defendant leave to return to and remain at the gathering site and participate in site restoration, in spite of a National Forest ban and the illegality of the gathering (177:41), the Magistrate indicated that the court agreed: the presence of the defendant was likely to lessen the impact of the gathering rather than increase it.

(E)     The Magistrate improperly asserted that a religious use defense, under RFRA, is the same as First Amendment facial challenge. This fact is fundamentally inaccurate. RFRA is a statute that was enacted by Congress, to these ends: *"(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government,"* (42 U.S.C. §§ 2000bb(b)(1-2)), in spite of the fact that, *"(4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually*

*eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion,"* (42 U.S.C. §§ 2000bb(a)(4)), (b) (1-2) and therefore in supplement to First Amendment claims, providing an affirmative defense under a more stringent test. Though the three cases cited by the magistrate challenge 36 CFR 251.54, they are also fundamentally different. The arguments of all three constituted facial challenges to the permit regulations as applied to the Freedom of Assembly and Freedom of Expression Clauses of the First Amendment. Neither the Free Exercise Clause nor RFRA were mentioned in any of the three cases cited. Given these substantial dissimilarities, it is the assertion of the Appellant that the precedents set forth in *Johnson, Masel,* and *Nenninger* do not, by themselves, constitute reason to dispense with the religious use defense put forth by the defendant at trial.

Refuting the five points of the magistrate's ruling, Appellant argues that a religious use defense, as set forth in RFRA, still weighs in this case and cannot be summarily dismissed; that each of the aspects of the defense must be brought to bear in the light of complete understanding. The following sections of this brief do just that, as well as addressing the first point made by the magistrate in his ruling: the existence of a substantial burden placed, by the government's enforcement of 36 CFR 251.54 and 261.10(k), on the right of the defendant to free exercise of his religious practices.

## 4. ESTABLISHMENT OF THE APPELLANT'S RELIGIOUS BELIEFS

During his ruling at trial, the magistrate referred only to substantial burden as an unproven point of the Warner Test (169:40). This would indicate, reasonably, that the Appellant proved the sincerity of his religious beliefs, for it follows that no substantial burden need be shown at all if there are no sincere beliefs to burden.

The government asserted to have no doubt of the defendant's "sincere belief in his position," (175:48) and referred to the web site of the RFLL as having the function of communicating information to "their followers," a loaded term (164:12). While neither of these statements is a *prima facie* concession of the Warner Test's first point, they indicate, in combination with other factors listed herein, that the prosecution does not refute the sincerity of the Appellant's religious beliefs. The government raised no objections of irrelevancy to the bulk of testimony and evidence presented by the defense to clarify the sincerity of religious beliefs held by the defendant; they brought neither evidence nor testimony in refutation of—and introduced evidence incidentally supporting—the sincerity of these beliefs.

Following is a summary the evidence and testimony presented in support of the sincerity of these beliefs. The relevant information can be broken down into five categories (A) existing precedent pertaining directly to the RFLL, (B) government admissions through witness testimony and evidence, (C) defense assertions through evidence, (D) the views of the defendant asserted via his statement, and (E) precedent that narrows or clarifies the manner in which religious beliefs are defined.

(A)     The RFLL has been described in federal district court findings as *"an unincorporated, loosely-structured group of individuals that regularly gathers in undeveloped sites in National Forests to pray..."* (Nenninger).

(B)     While testifying, Mr. Lynn admitted to having knowledge of individual camps, participants in the RFLL National Gathering, that appeared, by way of their naming conventions, to be drawn together for religious purposes (102:42). He admitted to have a solid understanding of the large prayer circle which occurs on July 4th at the

gatherings (106:06), and to have witnessed smaller circles (106:45) on other dates, both before the festival's commencement on the 1st of July (107:01, 107.24) and afterwards (107:51), and that these circles started on or before, July 13th, his first day on site (107:41). He admitted, without qualification, that welcomehome.org represented an accurate depiction of events that occur at RFLL national gatherings (88:27). Within government exhibits drawn from this website are numerous references to religious activity in connection with gatherings (exhibit 1, pgs. 1, 3-7, 11, 15-16, 18; and exhibit 2, pg. 2). It should be noted that spiritual references in the Mini Manual are not the work of a single author but the compilation of several authors, over a period of time, addressing RFLL beliefs and traditions (exhibit 1, pg. 19). The abundance of information introduced by the government along these lines not only lends weight to a tacit concession of the defendant's sincerely held religious beliefs but demonstrates that the agents of the government, including Mr. Lynn and the USFS, operated with prior knowledge of the religious nature of the group.

(C)     At trial the defense admitted sections of welcomehome.org, wherein the religious nature of the group is further clarified (exhibits C & D). Photographic evidence was admitted depicting attendees of the 2006 gathering involved in large prayer circles on July 4th (exhibit G) and June 26th (exhibit H).

(D)     The defendant attends RFLL National Gatherings because of a directive from God, for the purpose of prayer and meditation (149:23). Such attendance—including travel to and from the site, engaging in overtly spiritual activity at the site, and the day to day interactions between the defendant and other attendees—is a religious experience. At trial, the defendant waived Fifth Amendment rights to speak of the

religious significance, for him, of the RFLL gatherings (149:23) and this significance was corroborated by another witness (141:08). It should be noted that, in a case with striking factual similarities of public assemblies in a Cathedral of Nature, a district court held that, *"In determining whether a religious belief or practice is involved, emphasis should be placed on plaintiffs' 'inward attitudes towards [the] particular belief system' and great weight should be accorded to their claims that the beliefs and actions in question are an essential part of their religious faith,"* (STORM v. WOODSTOCK, 32 F. supp. 2d 520, 527 (N.D.N.Y. 1998); affd. 165 F. 3d 15 (2d. Cir. 1998) (internal citations omitted)).

(E)   In the past, federal courts have assisted us in identifying what constitutes a sincerely held religious belief or, rather, what does not constitute an insincere belief. They have declared that belief is neither contingent upon the existence of an organized faith—*"Undoubtedly, membership in an organized religious denomination, especially one with a specific tenet forbidding members to work on Sunday, would simplify the problem of identifying sincerely held religious beliefs, but we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization,"* (FRAZEE v. ILL. DEP'T OF EMPLOYMENT SEC., 489 U.S. 829, 834 (1989))— nor the existence of a standard set of tenets shared by all members of a faith—*"the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect... Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith,"*

(THOMAS v. REVIEW BD. OF IND. EMPLOYMENT SEC. DIV., 450 U.S. 707, 713-714 (1981) (hereafter Thomas)). Nor do protected religious beliefs need to be perceived as orthodox to be valid— *"the determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task... However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection,"* (Thomas).

## 5. EXAMINATION OF CERTAIN BELIEFS PERTINENT TO THIS CASE

The spiritual phenomena that is the RFLL began in 1972 (122.12). Since that time, a large body of spiritual traditions and beliefs has been collected and put into practice by attendees; information about these beliefs is generally available (exhibit 1). The Appellant has taken these beliefs as his own and voluntarily adheres to them, as do other attendees of the annual gathering. It follows that these beliefs must be considered tenets of faith.

Some of these beliefs are pertinent to this case and were presented at trial. They are reiterated below, as follows: (A) the definition of Living Light, (B) the importance of non-hierarchal structure, (C) council process, (D) religious factors involved in site selection, and (E) prayer circles and other spiritual activities.

Nothing herein should be construed to be official beliefs of the RFLL. Rather, they are religious tenets suggested by some attendees and adopted willingly by others, including the Appellant.

As a final note, the Appellant would remind the court that, as to the articulation of the following tenets appearing in evidence, introduced as testimony, and in general,

*"Courts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ," (Thomas).*

(A)     Members of the RFLL believe that "We are all One." (exhibit 1, pg. 1). This is, in essence, a highly pantheistic assertion. As is evident in the capitalization of the word "One," as well as in the fact that the assembly's name refers to gatherers as "Living Light." A pantheistic doctrine purports that the will of the divine acts directly through the men and women faithful to it.

(B)     Key to the emergence of the divine will is the removal of coercive relationships and harmful dynamics of competition inherent to any hierarchical structure. The RFLL refrains from internal government. (exhibit 1, pg 1). Participation at all levels is voluntary. The court seems to have recognized this tradition by classifying the RFLL as, *"an unincorporated, loosely-structured group of individuals,"* (Nenninger). From this adherence to a tradition of tribal anarchy have arisen two beliefs that are the crux of the difficulties between the government and the RFLL: that we may have no person or group of people represent the RFLL by signature or otherwise (150:03), and that we may never gather on private land (150:14). Mr. Lynn admitted prior knowledge of these traditions (108:05, 108:20).

(C)     Though the divine acts through gathering attendees at all times, nowhere is this fact more apparent or important than in council. Briefly, the council process is a set of traditions whereby participants in RFLL gatherings come together to communicate openly and freely. Therein the divine will is believed to speak directly through those involved (exhibit 1, pg  8). Though individuals are free to make personal decisions at

any time, it is only through council that group consensus can be reached (exhibit 1, pg 8). In this way, God is involved in every decision concerning the One that is the RFLL. It has been a long standing tradition that councils may only occur face to face (exhibit 1, pg 8) at gatherings, in a holy place called, "The Cathedral of Nature." (exhibit 1, pg 1). This tradition was also recognized by the court in describing the RFLL as a group, *"that regularly gathers in undeveloped sites in National Forests,"* (*Nenninger*).

(D)    Site selection begins at the end of a gathering, when Vision Council chooses the region for next year's pilgrimage (87:20). As with all councils, Vision Council is a forum for the divine to speak through attendees, guiding them through the most important decision made by the RFLL. After this augury, volunteer scouts use maps, aerial photos, and other leads to select potential sites in the region. After the snow melts, volunteer scouts coordinate through Scout Council, physically checking potential sites (exhibit 1, pg 2). Next, interested attendees gather for Spring Council, which, by the same spiritual process as Vision Council, narrows the choices until a single site is selected (87:35). In this way, the selection of the site for a gathering is a religious and spiritual experience and only remains so because of the traditions employed in making that selection.

(E)    One overtly religious practice at gatherings is the prayer circle. These occur before any council, before dining, and spontaneously wherever believers are gathered (155:30). Also present at gatherings are sweat lodge ceremonies, yoga, and religious workshops (exhibit 1, pg 15). RFLL spiritual practices occur throughout the gathering, not on specific dates (106.57).

### 6. BURDENS TO BELIEF POSED BY 36 CFR 251.54

As stated above, any examination as to the proper application of CFR 261.10k as applies to a non-commercial group must also explore CFR 251.54, because the two are inseparable in this regard, with the former qualified by the application of the latter.

This appeal does not attempt to enter into the long standing argument as to whether or not the applicable regulations unjustly limit freedom of assembly or expression but, rather, deals entirely with religious freedom as protected by RFRA.

36 CFR 251.54 directly imposes burdens on the Appellant's religious practices in two ways. Additionally, the improper application of the statute against gathering attendees creates a third conflict. The burdens imposed by the statute and its application to the RFLL are discussed below, as follows: (A) the signature requirement, (B) timeliness requirements, and (C) the process of site selection.

(A)      *"where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or **where it denies such a benefit because of conduct mandated by religious belief**, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists,"* (*Thomas*). In three places within the text of 36 CFR 251, the issuance of a permit relies on the willingness of a person or persons to sign the special use authorization. The most telling instance appears in CFR 251.62 which states, *"Refusal of an applicant to sign and accept a special use authorization within the time allowed, and before its final approval and signature by an authorized officer, shall terminate an application and constitute denial of the requested use and occupancy."* The applicant, therefore, is required to adhere his/her legal signature on behalf of the group (violating tenet outlined in section 5B of this brief) in order to reap the benefit

of public land use—in this case, the use of undeveloped sites in the National Forest (which are required by the tenets outlined in section 5B-C). It should be noted that it is the **signature requirement**, rather than the entire permit process, which offends these crucial tenets. Relief from the signature requirement may be all that is needed to remove substantial burdens.

(B)     This year, permit denial was based, in part, on timeliness issues: because more than 75 people were onsite before any application was submitted, no permit could be issued (108:54). The defendant, operating under the tenets of his faith, made no attempt to organize early arrivals so that they might obtain a permit, nor would he have been able to, as he had no control over their actions (112:00). The defendant arrived after 75 people were already present (162:17). In this way, the timeliness requirement made it impossible for the defendant to comply with the permit process. As Mr. Lynn stated at trial, the defendant's only recourse, at that point, was to leave, refraining from his religious practices (112:09). Please note, however, that this burden is fully dependant upon that raised in the previous section. In the past, before signature requirements became a part of the land use regulations, RFLL volunteers notified local rangers of potential sites long before large groups of people arrived (exhibit 1, pgs 2-3).

(C)     In CFR 251, it is plainly stated that it is the responsibility—and therefore the right—of the applicant to suggest the site(s) to be used. However, as stated by Mr. Lynn in court, it has become the practice of the USFS to suggest a small number of potential sites to RFLL scouts (120:36). As is evident from his tone, Mr. Lynn and his

team seem loathe to permit any site not suggested by them. This improper application

of CFR 251.54 offends the tenet outlined in sections 5(C-D) of this brief.

## 7. Interests Allegedly Served by 36 CFR 251.54

The task of proving that these burdens on religious practice serve government

interests—and that those interests are compelling—lay with the Appellee in this matter.

However, certain aspects of the government interests involved in the signature

requirement do seem to require comment from the Appellant and such has been provided

below. In no way should the lack of treatment of these points be construed as the

Appellant's concession of them.

The Forest Service names three major government interests served by their group

use regulations: protecting the public health and safety, managing resources, and

delegating land use between separate parties. The signature requirement plainly serves

none of these purposes directly. Each could be served by the issuance of a permit without

a signature.

In past cases, the existence of compelling government interests served directly by

the signature requirement has been a non-topic, except in one case. It was the opinion of

one Magistrate that the signature requirement in the regulations is tailored to serve those

purposes, because that requirement *"[1] is necessary to ensure that the group will be*

*responsible for the actions of its members as a whole, [2] to give the authorization legal*

*effect and [3] to subject the group to the authorization's terms and conditions,"* (*Masel*),

but the Appellant refutes this ruling as follows:

(1)   The signature requirement does not ensure that the RFLL will do anything. The

      signature is not recognized as valid by attendees (exhibit 1, pg 1).

(2)   For a signature to give anything legal effect, it must be provided willingly, not

under duress. Furthermore, to provide legal effect, a signature must be authorized by the people it is given on behalf of. Were I to enter into a legal contract on behalf of a corporation, without them authorizing me to do so, would that contract be binding to the corporation?

(3)     36 CFR 251.60 makes clear that violation of the terms and conditions of a special use authorization is grounds for legal revocation of the authorization, whether or not the holder consents, which is treated separately therein. With this recourse, the government need never prove acceptance of the terms themselves. It is within the jurisdiction of a court to enforce contracts entered into orally or by a physical sign of acceptance. How is this contract any different?

Furthermore, it should be noted that the burn permit issued to the defendant's camp (exhibit I) did not require a signature, yet it was considered sufficiently binding by the USFS and likely would be by the courts. Here we see the government placing great legal weight on a signature requirement in one instance, thereby placing a substantial burden on the defendant's practice of religion, and neglecting to require any signature in another instance when the signing would not have that effect (because the permit referred to facilities constructed by and under the control of the defendant, not the RFLL).

Finally, it should be noted that the inability of a RFLL gathering attendee to enter into written agreement on behalf of the group was well established and knowledge of it was publicly available at the time that a signature requirement was written into the regulations (exhibit 1, pgs 2, 19).

## 8. Means Less Restrictive than 36 CFR 251.54

Though the RFLL has been gathering since 1972 (122.12), permit regulations as written in 36 CFR 251.54 are a relatively recent development. Very few gatherings have

been permitted (120:15, 122:17). In past years, a "resource management" strategy was employed (143:52), successfully addressing all government and RFLL interests (144:49) without placing substantial burden on any religious beliefs. This fact is established by the existence of cleanup letters wherein the RFLL is commended for their compliance with government expectations (144:49, 145:22). The *prima facie* argument therein is that the use of mutual operating plans has been repeatedly demonstrated to be a less restrictive means of furthering the government interests—compelling or otherwise—in this case.

Additionally, other strategies might further the government's interests without restricting religious beliefs. One of these might be the issuance of separate permits, authorizing individuals or smaller groups to be in attendance at the gathering, in a manner similar to the issuance of burn permits. In this way, signatures could still be required without offending the religious tenets of attendees. Another strategy might be to issue a group use authorization as prescribed, but without a signature requirement.

From the above, it should be plain that the current application of 36 CFR 251—which is instrumental in classifying the National Gathering as an "illegal gathering," and therefore allowing for the enforcement of CFR 261.10k—does not represent the least restrictive means of furthering government interests in this case.

## 9. BURDENS TO BELIEF POSED BY 36 CFR 261.10(k)

Each year for six years, the defendant has made a pilgrimage to the Cathedral of Nature to pray with like-minded individuals (149:12). The destination of this religious pilgrimage is not a static place, it is the gathering itself, wherever it may be located on public land. This year, because a group of other practitioners stood up for their religious freedoms, the defendant's practices were deemed illegal by the government, resulting in the following actions:

On June 23 of 2006, a checkpoint was erected by the NIMT. This checkpoint abated traffic (113:26), physically preventing attendees from entering the gathering. Due to this checkpoint, the defendant was excluded from prayer circles and spiritual activities for almost 24 hours.

The defendant's vehicle was volunteered as a supply vehicle for RFLL use (135.57). This vehicle was targeted by the NIMT, detained for as many as three hours on at least one occasion (136.45) and apparently on more than one occasion. In doing so, the NIMT caused the defendant to be excluded from circles and other religious activities.

Though he never requested special concessions, the defendant was required to participate in an accelerated court proceeding supposedly set up for the convenience of all parties. In one instance, this arrangement required the defendant to appear in court less than sixteen hours after law enforcement contact (125:28, violation notice # F4067046). Due to enforcement against immediate family members and himself, the defendant was required to attend court appearances on four separate days (134:30; docket 6/23, 6/28, 7/2, 7/7). These were, in themselves, all-day events. Also, they required the performance of legal research and a level of personal hygiene that could not be accomplished at the gathering site. Altogether, these court appearances meant that the defendant was excluded from circles and spiritual activities for a total of six full days.

Throughout the gathering, the NIMT enforced CFR 261.10k with draconian tactics though the charge was to be considered a petty offense. Though checkpoints might have been established to issue tickets, the NIMT insisted on deploying large groups of officers, armed with machine guns and pepper spray, to selectively ticket inside the gathering (116:53). The officers were threatening and—on more than one occasion—initiated

physical harassment and violence against gatherers (153:26, 153:55, 159:27), including the defendant's wife (125:55, 134:50, 137:03). Altogether, the environment created by such tactics was completely counter-productive to the mindset necessary for a religious experience (159:42). It was, at many times, impossible to pray or meditate because of the general climate of fear and anger created by the NIMT.

For attempting to carry out his religious practices, the defendant was fined $100 (plus costs) by the court (177:22). The enforcement of CFR 261.10k therefore applied a financial burden to the defendant's practice of religion. As a condition of probation, the defendant was banned from all national forests for one year (177.41), effectively barring him from practicing his religion for an entire year, under threat of incarceration.

At trial, Mr. Lynn admitted that the intent of the NIMT was to stop the National Gathering (113:52), which was deemed illegal when attendees refused to violate their religious tenets. The defendant had no power to change the situation in such a way as to make the gathering legal. In order to avoid persecution and prosecution, his only recourse was to leave the area and refrain from practicing his religion.

## 10. INTERESTS ALLEGEDLY SERVED BY 36 CFR 261.10(k)

Again, the burden of proof lay with the Appellee in these matters, though certain points demand to be addressed preemptively. In no way should omissions by read as concessions by the Appellant.

Though the government attempted to stop the gathering, an estimated 15,000 were in attendance (95:05), which is average (87:02). This year, NIMT tactics caused mistrust and a lack of cooperation between officers and attendees. It is therefore questionable whether current enforcement strategies actually serve government interests at all, since they fail to prevent the event while further complicating USFS management of it.

Furthermore, as cited above, RFRA requires the courts to examine which compelling interests are furthered by application of the questioned statutes to an effected individual. The assertion that certain interests might be furthered by mass enforcement of land-use regulations against the RFLL as a whole should not weigh in this matter. Rather, it is necessary to examine which interests, if any, are served by the prosecution of this defendant or, in other words, which interests might be put at risk by granting a religious-use exception to this defendant.

The USFS names three major government interests served by their land-use regulations: protecting the public health and safety, managing resources, and delegating land use between separate parties. The individual presence of the defendant offended none of these, nor would granting religious exception to him have offended them. The ticketing and prosecution of the defendant did not further these claims.

This year, the chief interests cited by the government in this case were fire danger and timeliness issues. The fire danger interest was dealt with concurrently to this year's permit and land-use issues; full treatment of this topic appears earlier in this brief (section 3B). Timeliness issues were a direct result of religious discrimination written into 36 CFR 251 and would not have arisen if not for the government's insistence on applying these laws. Full treatment of this topic appears earlier, in section 7.

## 11. MEANS LESS RESTRICTIVE THAN 36 CFR 261.10(K)

The defendant and other regular attendees of RFLL gatherings have continually demonstrated a willingness to work with the NIMT and other USFS officials whenever the directives of those authorities have not conflicted with the religious beliefs of the group (146:32, 154.21).

This year, the defendant sought out officers to apply for a burn permit; voluntarily

made himself available for ticketing (126:10); stood by without interfering (130:40)
while his wife was surrounded and intimidated by ten heavily armed men (139.04); and
was cited in violation of no statute other than 36 CFR 210(k). It follows that he would
have cooperated with any permit process not aberrant to his religious beliefs. This
includes, but is not limited to the issuance of an individual camping permit (with or
without a signature requirement) or the issuance of a group-use permit not requiring a
signature.

   During the 2005 gathering, resource issues forced the group to move to a secondary
site (121:12). After holding council on the topic, the entire group moved willingly
(122:24), complying with government directives because moving was shown to be the
least restrictive means of dealing with the issues.

   There are other strategies that could be used to oversee and permit RFLL events. The
two most likely to work for all parties are those mentioned above: the issuance of a
group-use permit without requiring a signature, or the issuance of camping permits to
individuals and/or smaller groups.

   It should be noted that several preemptive attempts have been to communicate these
matters to the USFS, and several requests have been made for a less restrictive means of
enforcement (i.e. exhibit J). Yet the USFS and NIMT continue to ignore our pleas,
thereby burdening our right to religious freedom. It is unfortunate that the court's time
must be spent to mediate in these matters, but without willing concession from the USFS,
it seems that seeking judicial relief is our only recourse.

## 1 2. Closing Statements

   In public statements, including testimony, the NIMT and USFS claim that they have
no desire to bring an end to the RFLL traditions. However, their actions suggest

otherwise. Though Mr. Lynn claims that the same laws would apply to a boy scout troop or a group of hunters (113:52), a number of differences are obvious. Chief among them is the existence of the NIMT, a paramilitary enforcement group commanded by a man with extensive military experience (exhibit 1, pg 23-24), and assigned solely to the RFLL. The history of the land-use regulations is also suspect. These laws were written and applied to the RFLL and similar groups. On two separate occasions, the laws were challenged and overturned by federal courts but, rather than cease their unconstitutional efforts, the USFS reworked the letter of these laws and immediately returned to enforcing them against the injured groups, ignoring the spirit of court rulings (151:07, exhibit A).

If the USFS was interested only in furthering the interests put forth by them, they would be willing to compromise meaningless regulations, such as the signature requirement, to guarantee a group's cooperation. If the interests furthered were truly compelling, than the group's history of meeting them through cooperative operating plans would certainly overshadow the particulars of the current law. And if the USFS was interested in furthering these beliefs without offending the religious tenets of the RFLL, they would not have written 36 CFR 251 in such a way that it conflicted with those tenets, beliefs that were well known decades before the law was written.

Before instituting the current land-use regulations, the USFS solicited public comment, the majority of which was negative. Then, rather than make changes to the laws, they published a list of justifications arguing points of contention (exhibit A). In that publication, the government's only defense against objections based on religious freedom was the claim that 36 CFR 251 was facially neutral, containing no religious test (exhibit A, pg 4). Yet, in the case of the RFLL, the signature requirement *is* a religious

test.

It is not the intent of the defendant to seek complete exemption from government controls designed to protect public lands. Interviews conducted at the gathering revealed that the majority of attendees would enter into and abide by a permit process that did not force them to break tenets of their faith (152:10). The defendant is willing to work within his beliefs to ensure that government oversight is a factor at National Gatherings. However, like all citizens, the Appellant has a right to pursue his religion without undue interference from the law. The compromise required to satisfy both parties in this matter is simple and easily implemented. The RFLL has made several concessions, yet the USFS has done nothing but dig in their heels, compose more restrictive regulations, step-up enforcement tactics, offer fewer acceptable (to them) sites each year (120:36), and flatly refuse to allow for our religious freedom.

Nor is this a new twist. *"It would be impossible to estimate the judicial resources that have been expended through the years in the many legal contests between the Rainbow Family and the Forest Service... Obviously, scarce resources of the Court, the Justice Department and the Forest Service have been expended to handle this case and the many others involving the Rainbow Family through the years, and always of the same issue -- refusal to apply for a permit."* (UNITED STATES v. KAHB, BECK, & SEDLACKO). The Appellant might add that the issue of disagreement here is not just that of the group's refusal to apply for a permit, but that of a government agency which insists on enforcing statutes attendees cannot abide by without compromising their religious beliefs. This court has the power to put an end to the struggle once and for all, by overturning the lower court's guilty finding in this matter.

A verdict of not guilty because of religious burden would create a precedent effectively exempting those attendees for whom the gathering is a religious experience, leaving the USFS free to ticket and prosecute other attendees while removing burdens on religious practice.

Fair judicial treatment of the signature requirement would open the door to injunctive relief for the RFLL, requiring the USFS to offer an alternative permit application process that is not offensive to the group's religious tenets. Such an alternative process need not be overly permissive and, in fact, would be acceptable almost as is. Required changes would be simple and would not limit the government's oversight, yet it seems that the USFS will not make even simple concessions unless forced to do so by the courts.

In closing, it has been shown that the defendant, in attending the 2006 National Gathering, was practicing his sincerely held religious beliefs and that such practices were substantially burdened by the government's enforcement of 36 CFR 261.10k. It has been demonstrated that the interplay of 36 CFR 251.54, required to apply CFR 261.10k, also resulted in burdens on the religious beliefs of attendees. Furthermore, it has been demonstrated that involved government interests are typically less than compelling in nature when they exist at all, that exemption of the defendant or the RFLL would not have endangered said interests, and that the current regulations in no way represent the least restrictive means of furthering those interests.

It is the belief of the Appellant that this case can have no reasonable outcome except a finding of not guilty for reason of religious practice, and therefore an overturning of the Magistrate's ruling in this matter.

## 13. INTERNAL PROCEDURES FOR CITING EVIDENCE AND TESTIMONY

Within this brief, evidence is cited by exhibit number (prosecution) or letter

(defense), and by page number, where applicable.

Lacking a written transcript, the Appellant was required to cite statements—including testimony—by providing corresponding time log entries from the digital audio transcript of the original proceedings, provided by the court. Time log entries conform to the format on the original recording (minutes:seconds), which included two trials. Only the second trial, the Appellant's, was cited.

External case citations were made using the standard format except in one instance. In section 12, a case cite was used for which the Appellant could not find the date or specific district/circuit involved, as these details were absent from court documents. In this instance, the case was cited by name alone, but the use of the quote is rhetorical rather than evidentiary, and appears in the summation. Upon request, Appellant can produce the document from which the quote was drawn.

Dated:

Scott Sowka (pro se)
2521 Courtland Ct. ~ Fort Collins, CO 80526
(503) 984-6841 ~ madpoet418@yahoo.com

x _Scott S____

(Rev. 04/15/02)