CERTIFIED ORIGINAL

1

1

## CD TRANSCRIPTION

2

## UNITED STATES OF AMERICA V. SCOTT SOWKA

3

F4067046

4

5

6

7

8

9

10

11

12

13

14

15

16

19

20

21

22

23

24

25

```
1                        I N D E X

2                                          Page Number

3    GOVERNMENT'S CASE

     TIM LYNN
       Direct Examination by Mr. Nasrullah          8
5      Cross-Examination by Mr. Sowka              21
       Redirect Examination by Mr. Nasrullah       41
6      Recross-Examination by Mr. Sowka            43

7    JAN CROAKSTEAD
       Direct Examination by Mr. Nasrullah         45
8      Cross-Examination by Mr. Sowka              49
       Redirect Examination by Mr. Nasrullah       53
9
     DEFENDANT'S CASE
10
     CHRISTINE SOWKA
11     Direct Examination by Mr. Sowka             54

12   ROB SAVOYE
       Direct Examination by Mr. Sowka             62
13
     SCOTT SOWKA
14     Narrative By Scott Sowka                    68
       Cross-Examination by Mr. Nasrullah          74
15     Narrative continued By Scott Sowka          75

16   CLOSING ARGUMENT
       By Mr. Nasrullah                            76
17     By Mr. Sowka                                79

18

19

20

21

22

23

24

25
```

1                        E X H I B I T S

2  GOVERNMENT'S EXHBITS           Initial Reference      Admitted

   1  Mini Manual                        17                17

4  2  Information from welcomehome.org    17                17
      website

5
   3  Map of site                        17                17

6  DEFENDANT'S EXHIBITS

   A  Official document of the           23                24
8     Forest Service and Federal
      Register
9
   B  Federal Statute                    26                27
10
   C  Home Page                          27                27
11
   D  Home Page                          27                27
12
   E  Photo of informational checkpoint  70                73
13
   F  Photo                              70                73
14
   G  Photo of 4th of July circle        71                73
15
   H  Photo                              71                73
16
   I  Photo of permit                    71                73
17
   J  Letter by Gary Atlins              72                73
18

19

20

21

22

23

24

25

000014

(Start time 11:00:06:01)

THE COURT:  Okay.  It's -- at this time I would like to call Case Violation Notice F4067046, United States of America versus Scott -- is it produced Sowka?

MR. SOWKA:  Sowka.

THE COURT:  Sowka.  Sorry.  And this matter is set for purposes of trial.  Any preliminary questions, Mr. Sowka?

MR. SOWKA:  I do have two questions and one motion, your Honor.  The questions are pretty -- pretty general.  First, I have never been in federal court before.  I was wondering if there was an opportunity for closing statements by prosecution and defense in this matter?

THE COURT:  Uh-huh.  Be brief, though, but, yes.

MR. SOWKA:  Yes, very brief.  The second question, Your Honor, is I do have some defense exhibits, and I do not -- was not informed of the filing procedures for them, or I don't have stickers for them.

THE COURT:  Just wait a minute, and we'll get you some stickers.

MR. SOWKA:  Thank you.  I need --

THE COURT:  How many?

MR. SOWKA:  -- eight, Your Honor.

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014  (720) 449-0329  FAX (720) 449-0334

```
1                  THE COURT:  How many?

2                  MR. SOWKA:  Eight stickers, Your Honor.

3                  THE COURT:  Okay.

4                  MR. SOWKA:  And I would like to make a motion

5     before this matter.

6                  THE COURT:  Let's hang on a second.

7                  MR. SOWKA:  Sure.

8                  THE COURT:  I'm not capable of more than one

9     thing at a time.

10                 MR. SOWKA:  Me either.

11                 THE COURT:  (Inaudible.)

12                 MR. SOWKA:  I can just mark them with this?

13                 UNIDENTIFIED FEMALE SPEAKER:  Yeah.  And then

14    if you'll just put on . . .

15                 MR. SOWKA:  Is it A -- is it A, B, C or 1, 2,

16    3?

17                 THE COURT:  Choose A, B, C.

18                 MR. SOWKA:  That's what I thought.  Thank you,

19    Your Honor.  And I have one for the prosecution and one

20    for the judge, correct?

21                 UNIDENTIFIED FEMALE SPEAKER:  You could just

22    put one for the judge and the prosecutor on this one.

23    (Inaudible.)

24                 MR. SOWKA:  Yeah.  (Inaudible.)

25                 THE COURT:  You can handwrite
```

Exhibits A, B, C.

        MR. SOWKA:  Okay.  Thank you.  (Inaudible.)  I hate to hold up the court.  I can do this during the proceedings.  I can proceed, if I must.

        THE COURT:  If you can do two things at once, that's fine with me.

        MR. SOWKA:  I don't want to hold us up.

        THE COURT:  Take your time.  Don't worry.

        MR. SOWKA:  Thank you, Your Honor.

        THE COURT:  All set?

        MR. SOWKA:  Yes.

        THE COURT:  Okay.  Back on the record.  You said you had a motion.

        MR. SOWKA:  I do, Your Honor.  I have been witness to several cases dismissed on technicalities for ticket errors.  And I assume that it is important to go through defense and prosecution to reach a verdict in this matter, so I would like to motion that the ticket be examined before this proceeding starts, and we move to amend to avoid these errors.

        UNIDENTIFIED MALE SPEAKER:  I object, Your Honor.

        THE COURT:  Well, up until this point, I would say you're a pretty good lawyer.  Government, do you have any objection?

MR. NASRULLAH:  No, Your Honor.

2          THE COURT:  Okay.  How would you like to --

3          MR. NASRULLAH:  Oh, I'm sorry.

           THE COURT:  Okay.  How would you like to --
would you gentlemen like to take a look --

6          UNIDENTIFIED MALE SPEAKER:  Yes, we'd like to

7   do that.

8          THE COURT:  Mr. Nasrullah, Mr. Sowka, if you

9   would like to look at each other's tickets so you can

10  straighten them out, however you would like to straighten

11  them out.  That's a first, I've got to tell you.  That is

12  a first.

13         MR. SOWKA:  Your Honor, I've come a long way

14  to be in this courtroom.  (Inaudible.)

15         THE COURT:  That's also a first.  (Inaudible.)

16         UNIDENTIFIED MALE SPEAKER:  You're the first

17  person who wanted to be here.

18         THE COURT:  Okay.  How's the --

19         UNIDENTIFIED MALE SPEAKER:  Other than

20  Ms. Triplet (phonetic), you're the only person who wants

21  to be here.

22         THE COURT:  Okay.  How -- if at all, how would

23  your -- either your ticket or the Court's ticket, would

24  the parties ask that they be amended, if at all.  I don't

25  know.

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

1          MR. NASRULLAH:  Your Honor, I don't believe

2    there's an error to the tickets.

3          MR. SOWKA:  You don't believe there's an

4    error.  Very well, Your Honor.  Then the defense --

5          THE COURT:  Okay.

6          MR. SOWKA:  -- (inaudible) the motion.

7          MR. NASRULLAH:  Okay.  The government would

8    call Tim Lynn (phonetic).

9          THE COURT:  Mr. Lynn, if you raise your right

10   hand.  Under penalty of perjury, solemnly swear the

11   testimony you're about to give is the truth, the whole

12   truth and nothing but the truth?

13         THE WITNESS:  I do.

14         THE COURT:  Have a seat, Mr. Lynn.

15                    DIRECT EXAMINATION

16   BY MR. NASRULLAH:

17     Q    Sir, would you tell the Court what you do for

18   a living.

19     A    My name is Tim Lynn.  I'm patrol captain for

20   the U.S. Forest Service, and I'm assigned as the incident

21   commander for the incident management team for the annual

22   gathering of the (inaudible).

23     Q    And can you describe what the incident

24   management team consists of?

25         THE COURT:  Mr. Nasrullah, you're more than

000019

welcome to sit or stand.

2          MR. NASRULLAH:  I'm sorry, Your Honor.

3          THE COURT:  Whatever you're most comfortable

4   with.  Okay.

5          MR. NASRULLAH:  Thank you, Your Honor.

6          THE COURT:  Okay.  Sorry to interrupt.

           THE WITNESS:  The incident management team

8   comes out to help assist the host forest with the annual

9   gathering, providing resource personnel and also various

10  disciplines, as far as administration, planning,

11  operations, communications, information, come out to

12  assist the host forest, to try to lessen the impact on

13  that host district that has the annual gathering so that

14  the employees that are on that host district can continue

15  in their normal activities --

16      Q     (By Mr. Nasrullah)  And what --

17      A     -- when the annual gathering occurs.

18      Q     And what annual gathering are we talking

19  about?

20      A     The annual gathering of the Rainbow Family of

21  Living Light.

22      Q     And what kind of impact are we talking about?

23      A     Some of the impact on our resource concerns

24  regarding trails that are set up, kitchens.  There's also

25  split trenches, compost pits.  There's concerns over the

000020

irrigation systems that are set up that -- safety and

2  health concerns for the -- for the participants, as well

3  as the possible communities that can be affected by where

4  the gathering occurs, if it's a water source for a nearby

5  community.

6      Q    And have you had past experience with the

7  Rainbow gathering?

8      A    Yes.

9      Q    And could you describe that briefly?

10     A    This is my third year as the incident

11 commander for the annual gathering that occurs each year.

12     Q    And where were the gatherings the first two

13 years that you were involved with them?

14     A    2004 was in Northern California, in the Modoc

15 National Forest.  In 2005, it was in the Omapahele

16 National Forest, in West Virginia.

17     Q    And, in 2004, how many participants were there

18 to this gathering?

19     A    Approximately 20,000.

20     Q    And what about in 2005?

21     A    10,000.

22     Q    And what's your understanding of how the

23 decision is made by the Rainbow Family of -- as to what

24 location they're going to pick for the gathering?

25     A    At the end of the previous year's annual

000021

gathering, they hold what's called a Vision Council.  The

Vision Council will discuss where the next year's annual

gathering is going to be held.  They'll narrow it down to

the state.

        And then throughout the year there's smaller

6   gatherings, like a Thanksgiving Council.  And in the

7   spring, there's a Spring Council.  The scouts go out and

8   look at various locations in the national forest.  And

9   through that, that's how they select how the -- that's

10   the final selection for the national gathering.

11      Q   And how far in advance of the gathering is

12   this -- is this decision communicated to the Rainbow

13   membership?

14      A   The Spring Council is usually held the last

15   week of May or the first part of June.

16      Q   And how is this decision communicated?

17      A   It's communicated through either a website,

18   various websites, one of which is welcomehome.org, or

19   through (inaudible).

20      Q   Okay.  I'm going to hand you what's been

21   marked as Government Exhibit Number 1.  Could you

22   identify it -- that for the record, please.

23      A   This is a mini manual.  If you look at the

24   bottom, it's welcomehome.org.  That is the website that

25   it came from.  It's an accurate depiction of what events

000022

1    occurred out in the national gathering -- or the annual

2    gathering, activities (inaudible).

3         Q    And what's exhibit -- Government Exhibit 2?

4         A    Government Exhibit Number 2 is also taken from

5    a welcome home website.  It provides you directions and

6    transportation options.  And it also has a map to let you

7    know how to get there.

8         Q    And how are you familiar with this particular

9    website system?

10        A    This is just one of the websites that I have

11   looked at within the capacity as an incident commander.

12        Q    And did you examine these documents prior to

13   coming here today?

14        A    Yes.

15        Q    Now, since the end of the last gathering, what

16   is your understanding of the communications, if any, that

17   have been between the Family and Forest Service with

18   respect to a permit?

19        A    The -- at the end of last year's annual

20   gathering, myself and others with the Forest Service

21   attempted to contact various members who were present at

22   last year's annual gathering, to work with them and

23   convince them to get a noncommercial-group-use permit for

24   this year's annual gathering.

25             Those contacts were established throughout the

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

1   year, but no one came forward to sign a

2   noncommercial-group-use permit.

3        Q    So there's no permit -- there's no permit in

4   existence today for this particular gathering?

5        A    No.

6        Q    When did the gathering start?

7        A    According to the -- according to the website,

8   if you look at Government Exhibit Number 2, they

9   advertise that it starts July 1st and runs through

10  July 7th, but there were participants and individuals

11  on-site as early as June 13th.

12       Q    And where has this gathering taken place?

13       A    This is on the Routt National Forest, in the

14  state of Colorado.

15       Q    And could you describe the gathering in terms

16  of -- of its organizational structure, if you've been

17  able to observe it?

18       A    They have kitchens and Post Village, Kiddie

19  Village.  They have the CALM unit, which is the Center

20  for Alternative Living Medicine.  They have irrigation

21  systems that are set up.  They have water purification

22  systems that are set up, hand washing stations.

23            A communication system that they set up is

24  also through the use of walkie-talkies.  They communicate

25  with one another as soon as forest service personnel

000024

1    enter into the gathering area.  And they're also

2    monitored throughout the time that they are walking

3    through the gathering area.

4        Q    And are there any scheduled activities that

5    you're aware of?

6        A    As far as scheduled activities, there's

7    various activities.  They apparently have a theater, that

8    this year, I believe, is in the shape of a pirate ship.

9    And then they have workshops along a Trade Circle, where

10   they barter.  There's a barter system.  They trade items.

11       Q    What about medical facilities?

12       A    The medical facility, the Center for

13   Alternative Living Medicine, is also present there to

14   establish -- similar to a M.A.S.H. unit.

15       Q    And what about peace keepers?  Do they try and

16   police themselves?

17       A    They refer to the peace keepers as Shanti

18   Sena, and those are supposed to police themselves.

19       Q    And I'm showing you what has been marked as

20   Government Exhibit 3.  Are you familiar with that

21   document?

22       A    Yes.

23       Q    Could you -- what is it?

24       A    This is a map that was produced by the ranger

25   district here showing the camp and kitchens that are

000025

present.  It is a smaller version of what we had placed
upon the wall.

3              If you look on the wall, the date of that
particular map is up in the top right-hand corner,
July 3rd, 2006.  And it just blows up this area that was
6   also located on Exhibit Number 3.

7              It doesn't show as many kitchens as what this
particular map has, but is a close representation of what
9   you see here.

10         Q    Okay.  And does Exhibit 3 truly and accurately

11   depict, essentially, the area in which the gathering was

12   taking place?

13         A    Yes.  The officers and, also, resource

14   personnel that were sent out in the area carry a GPS unit

15   with them.  As they rode to the kitchen and camps, they

16   GPS'd that location, and that's how those locations are

17   depicted on the map.

18         Q    And when did this depiction take place?  When

19   was the map produced?

20         A    It actually occurs daily.  The maps are

21   amended as the -- as the gathering or participants grow

22   and the number of kitchens increase or camps or other

23   locations that may be of a particular concern, so it's

24   done on a regular basis.

25         Q    And would you describe for the record

000026

boundaries within which this gathering took place this
year, in 2006?

3        A      If you look on the map, you can see red
4   squares that are depicted on there.  Each one of those
represents one mile.  And within that, you can see that
there are camps located within two square miles and then,
also, approximately one square mile heading west.

8        Q      Are there any roads that essentially define
9   the boundaries of this gathering?

10       A      There are -- there are no roads.  The
11  boundaries are basically determined by where we find the
12  camps and kitchens and the trail system that is present,
13  that is -- that becomes present from all the activity,
14  all the participants there and all the walking and --
15  between the camps and kitchens.

16       Q      So would you describe these trail systems?

17       A      Most of them are foot trails that exist.  Some
18  of them, they use the existing road system, as you can
19  see, on this Map 505.1, indicates where the A Camp is.

20              And there are participants that use that
21  main -- or that particular Forest Service road, also down
22  520, 520.1 Road, and they use that road, as well, to
23  travel.

24              MR. NASRULLAH:  For the purposes of the
25  record, the government would move for admission of

000027

1 Exhibits -- Numbers 1, 2 and 3.

    THE COURT:  Mr. Sowka?

    MR. SOWKA:  As it pertains to Exhibits 1 and

4 2, the defense is frightened by the precedent of

5 inserting into the record as factual evidence anything

posted by an individual on the Internet, but we will --

7 but I will reserve my objections so far as the entire

8 site is admitted as evidence.

9    THE COURT:  All we have is Exhibit 1.  I have

10 no earthly idea whether it's the entire site or not, but

11 it's as to Exhibit Number 1.  That's the question that we

12 have right now.  And if you have an objection as to

13 Exhibit 1, 2 or 3, you need to state it.

14    MR. SOWKA:  No objections, Your Honor.

15    THE COURT:  Okay.  Then Exhibits 1, 2 and 3

16 are admitted into evidence.

17    MR. NASRULLAH:  Thank you, Your Honor.

18   Q (By Mr. Nasrullah)  Sir, when did you arrive

19 at the announced location in the Routt National Forest

20 this year?

21   A The team arrived on June 12th, and then began

22 doing vehicle and foot patrols on June 13th.

23   Q And were you part of these vehicle and foot

24 patrols?

25   A On June 13th, I was part of the vehicle

18

patrol.

Q    And at what point in time this year did the gathering -- the number in the gathering exceed 74?

A    On June 13th.

Q    And based on your observations from this -- from that point in time forward, has the size of the group grown or reduced?

A    It has grown.

Q    And what was the highest number of people that you were able to estimate?

A    On July 4th, at its peak, it was estimated that approximately 15,000 people were present.

Q    What about July 1, 2006?  Were you able to estimate what the number was that day?

A    July 1st, it was estimated probably around 10,000, growing rapidly as the 4th approached, the 4th of July.

Q    And on that date what was the approximate size of the area that the group occupied?

A    Again, looking at Government Exhibit Number 3, there was camps that were located that aren't depicted on this map, but it encompassed an area -- actually, it was down almost to the bottom of this particular map, encompassing these two square miles and then areas going west another square mile, so a total of three square

000029

1    miles.

2         Q    And does Government Exhibit Number 3

3    essentially indicate that the topography depicted therein

4    is part of the Routt National Forest?

5         A    Yes, sir.

6         Q    Now, what efforts did the Forest Service

7    undertake to inform individuals that were attending this

8    gathering about the need for a permit?

9         A    The -- the safety and information checkpoint

10   was set up at the intersection of the 500.1 and the 505.1

11   Road.  If you look on this map again, there was an

12   A Camp.

13           The first safety and information checkpoint

14   was set up there to inform individuals, if they proceeded

15   in, it was an illegal gathering, that there had not been

16   a noncommercial-group-use permit applied for.  And then,

17   also, fliers were handed out.

18        Q    Okay.  So there was verbal advisement, as well

19   as fliers?

20        A    Yes.

21        Q    And on July 1 was that camp in the same

22   location that you just described?

23        A    Yes.

24        Q    And do you know how many fliers were handed

25   out at the time?

                                        000030

A     Over 4,000 fliers had been handed out.

Q     And did this procedure continue, essentially
handing out the fliers and advising people verbally?

A     Yes.

Q     And how long -- what date did it continue up

6    until?

7    A     It continued up until July 4th.

8          MR. NASRULLAH:  Your Honor, if I may just have
15 seconds?

10         THE COURT:  Sure.

11         UNIDENTIFIED MALE SPEAKER:  (Inaudible.)  I'll

12   ask again.

13   Q     (By Mr. Nasrullah)  And just so that we're

14   clear, so all of the area that we've been talking about

15   in which this gathering took place was within the Routt

16   National Forest, correct?

17   A     Yes, the Routt National Forest, within

18   Colorado.

19   Q     And is that a part of the national forest

20   system?

21   A     Yes.

22   Q     And that's within the state and district of

23   Colorado?

24   A     Yes, sir.

25   Q     All right.  Thank you.

000031

1    UNIDENTIFIED MALE SPEAKER:  Your Honor, I --

2    (inaudible).  He doesn't know.  He doesn't know.

3        Q    (By Mr. Nasrullah)  And, as I understand it,

4    you haven't had any contact yourself with this particular

5    defendant, correct?

6        A    Right.

7        Q    Thank you.

8        MR. NASRULLAH:  Your Honor, there's no further

9    questions of this witness.

10       THE COURT:  Okay.  Thank you.  Mr. Sowka,

11   questions for this witness.  It's your opportunity to

12   question this witness, not to make a statement.  We'll

13   give you that opportunity later.  This is questions for

14   this witness.

15       MR. SOWKA:  Absolutely, Your Honor.

16                  CROSS-EXAMINATION

17   BY MR. SOWKA:

18       Q    I hate to ask you to repeat yourself,

19   Mr. Lynn, from the last trial, but how long have you been

20   with the Forest Service incident management team?

21       A    How long?

22       Q    Not necessarily in the role of commander

23   but . . .

24       A    Oh, this is my third year.

25       Q    This is your third year?  So you don't have --

000032

well, actually, let me take that back.  So this is your

2    third year at all being involved with the Rainbow Family?

3         A    You're going to have to repeat that.

          Q    How -- how long have you been involved with

5    the Rainbow Family in law enforcement?

6         A    In 1998, when I became a law enforcement

7    officer with the Forest Service, I was on the Mark Twain

8    National Forest in Missouri.  And there were some

9    individuals that happened to be on the Rallo -- Ralla

10   Houston Cedar Creek Ranger District (phonetic) that I was

11   an officer, on that said they were associated with the

12   Rainbow Family.  And there was a group of maybe 20, 30

13   people.

14        Q    Okay.  And how many -- how many national

15   gatherings have you attended?

16        A    This is my third one.

17        Q    Your third one.  So all of the gatherings that

18   you've attended had been permitted gatherings except this

19   one?

20        A    Yes, sir.

21        Q    So you have no experience with the Forest

22   Service/Rainbow before 1993?

23        A    1998.  No.

24        Q    And so, obviously, not before '88 or '84, when

25   the first regs were . . .

                                              000033

23

```
 1          A    Another -- another agency at that time.
 2               MR. SOWKA:  So I would -- if I may approach
 3     the bench --
 4               THE COURT:  Sure.
 5               MR. SOWKA:  -- I would like to hand you what's
 6     been marked Defense Exhibit A.  I'm handing a copy to
 7     (inaudible).
 8               MR. NASRULLAH:  Thank you.
 9               THE COURT:  Thank you.
10               MR. SOWKA:  (Inaudible.)  I should have
11     brought four, huh?
12          Q    (By Mr. Sowka)  Can you identify this
13     document, Mr. Lynn?
14          A    This is (inaudible) 251 and 261.
15               MR. SOWKA:  And if the record may show that it
16     is actually only the first five pages of the document.
17          Q    (By Mr. Sowka)  I have -- and this is an
18     official document of the Forest Service and the federal
19     register?
20          A    It says "Federal Register" at the top.
21               MR. SOWKA:  I would like to move at this time
22     that this be admitted as Defense Exhibit A.
23               THE COURT:  Mr. Nasrullah --
24               MR. NASRULLAH:  Your Honor --
25               THE COURT:  -- what is the government's
```

000034

1    position?

2            MR. NASRULLAH:  (Inaudible.)  I just wanted to

3    see whether this was the most-current version of the

4    regulation, because it says it's a 1995 issue date, but

5    be that as it may, this essentially seems to be the

6    regulation.

7            I'm not sure it needs to be in evidence, but I

8    think the Court can take judicial notice that -- if you

9    deem to do that, so (inaudible).

10          THE COURT:  We're going to -- at this time,

11    I'm going to admit Exhibit A.

12          MR. SOWKA:  Thank you, Your Honor.

13       Q   (By Mr. Sowka)  And, Mr. Lynn, if you would,

14    could you read the first -- the first highlighted

15    portion?

16          THE COURT:  Well, let me -- well, let me

17    interrupt you.

18          MR. SOWKA:  Sure.

19          THE COURT:  The entire exhibit is in evidence.

20    It doesn't need to be repeated right now --

21          MR. SOWKA:  Okay.

22          THE COURT:  -- any part of it.

23          MR. SOWKA:  Okay.  Thank you, Your Honor.

24       Q   (By Mr. Sowka)  So back to your experience

25    with the Rainbow Family.  Mr. Lynn, I heard you earlier

000035

 1   naming off some camps, like the Center for Alternative

 2   Living Medicine and A Camp.  Are you familiar with a

 3   number of the camps?

 4        A    Some of them I am.  Not all of them.

 5        Q    Have you heard or had interaction with Jesus

 6   Kitchen?

 7        A    Yes.  Last year.

 8        Q    Have you heard of Christian Camp?

 9        A    Christian Camp, yes.

10        Q    Jerusalem Kitchen?

11        A    Last year.  Yes, last year, 2004.

12        Q    Have you had interaction or heard of the High

13   Cafe?

14        A    No.

15        Q    Oh, and would you agree that these camps are

16   bound together by a religious purpose?

17        A    I don't know.

18        Q    Would it be done -- and do you think it would

19   be demonstrated by their names if they are?

20        A    The names do depict that there is some type of

21   religious belief, yes.

22             MR. SOWKA:  At this time, I have a slew of

23   exhibits to introduce, Your Honor.  If I may approach the

24   bench, I will --

25             THE COURT:  Let's make sure you get a copy to

000036

1    the government.

2              MR. SOWKA:  Yes.

3              THE COURT:  We're happy to take your slew.

4              MR. SOWKA:  Thanks for your sense of humor,

5    Your Honor.  At this time, these are B, C and D.

6              MR. NASRULLAH:  Thank you.

7              THE COURT:  Thank you.

8              MR. SOWKA:  And I seem to be missing one.  I

9    did hand you guys a copy of C?

10             UNIDENTIFIED MALE SPEAKER:  You could check.

11        Q    (By Mr. Sowka)  Mr. Lynn, can you identify

12   Exhibit B?  I'm sorry.  What's been marked as Exhibit B?

13        A    This looks like it's -- it says, "Part 251."

14   It does not say whether it is CFR 251 on the first --

15   first page.

16             MR. NASRULLAH:  Again, this is a federal

17   statute.  I don't know that it needs to be admitted into

18   evidence, but, just in case, I wanted to bring it along.

19   For the record, I'd like to note that --

20             THE COURT:  Are you trying to -- let me

21   just -- are you trying to get Part 251 of 36 Court of

22   Federal Regulation into evidence?

23             MR. NASRULLAH:  Yes.

24             THE COURT:  And the Court will take judicial

25   notice of that regulation.                    000037

MR. NASRULLAH:  Thank you, Your Honor.  I apologize (inaudible).

3        THE COURT:  And as to Exhibit B, assuming it's
4 identical to that part, does the government have any
5 objection?

6        MR. NASRULLAH:  No, Your Honor.

7        THE COURT:  Then Exhibit B is admitted into
8 evidence.

9        Q    (By Mr. Sowka)  As to Exhibit C and D, can you
10 identify these exhibits?

11        A    Yes.  It looks like the home page for the
12 welcomehome.org.

13        Q    And do you have experience with this site --
14        A    Yes.

15        Q    -- sir?  So -- and this site pertains to the
16 National Rainbow Gathering?

17        A    It's a very accurate depiction of what occurs
18 there at the annual gathering, yes.

19        MR. SOWKA:  Okay.  And then the defense will
20 move that Exhibit C and D be admitted into evidence.

21        MR. NASRULLAH:  No further -- no objection to
22 C, Your Honor, and no objection to D.

23        THE COURT:  Exhibits C and D are admitted into
24 evidence.

25        MR. SOWKA:  Now, though, I understand, Your

000038

1    Honor, that we wouldn't like repetition here, there is

2    some very important items on those, the highlighted

3    items, that I would like to recognize on the record.

4            THE COURT:  Well, they are on the record,

5    because the exhibits are admitted into evidence, and I've

6    read the highlighted areas.

7            MR. SOWKA:  Okay.  Thank you, Your Honor.

8        Q    (By Mr. Sowka)  So once again -- I'm sorry I'm

9    skipping around here.  Back to your -- your experience

10   with Rainbow gatherings, Mr. Lynn.  So can you tell me,

11   in your own words, what happens among the Rainbows on the

12   4th of July at the annual gathering.

13       A    I believe, in the morning, they go out and

14   form a large circle and join hands.  And it's their day

15   of peace, where they pray for peace.

16       Q    And do you know if -- do you know about

17   silence that's held on this day?

18       A    Yeah.  I believe that they try to convince the

19   participants to be silent during that time, while they

20   gather around there.

21       Q    And do you know how long that silence lasts?

22       A    I think up to four hours.  It's early in the

23   morning (inaudible).

24       Q    Thank you, Mr. Lynn.  And have you witnessed

25   or had experience with other prayer circles at the

                                          000039

1    Rainbow gatherings?

2         A    Smaller ones?

3         Q    Yes.

4         A    Yeah, I've seen some of those.

5         Q    And have -- is there any specific dates

6    attached to those?

7         A    No, sir.

8         Q    Have you seen them before the 1st of July,

9    when the gathering officially starts?

10        A    There were some smaller groups, like where

11   main -- if you look on the -- the large map where the

12   Main Meadow is, there were some groups that were bound

13   for the Main Meadow, where only the smaller circles are.

14   I don't know what they were doing, what it was for,

15   whether they were praying, talking.

16        Q    But you did see this before the 1st of July?

17        A    Yes.

18        Q    And in your experience in past years, have you

19   seen this happen after the 7th of July?

20        A    No.

21        Q    And have you seen it happen on other days

22   other than the 4th, between the 1st and 7th of July?

23        A    Like, when we first showed up -- the team

24   first showed up on the 12th and then came through on the

25   13th, there were small circles here and there, where the

1   people were joining hands and . . .

2        Q     Okay.  But the question was, Have you seen it

3   between the 1st and 7th of July, other than on the 4th,

4   on the 1st of July or the 2nd or . . .

5        A     (Inaudible.)

6        Q     Do you -- have you heard the Rainbow Family

7   belief that no person has the right to represent the

8   Family?

9        A     Yes.

10       Q     And do you know what this belief is founded

11  on, how this belief came about?

12       A     Not exactly.

13       Q     Do you know that -- do you know about the

14  Rainbow tradition of gathering on public lands rather

15  than private?

16       A     Yes.

17       Q     And do you know how this belief came about?

18       A     No, I do not.

19       Q     All right.  So that's enough about that topic.

20  Let's move on to these current issues.  This gathering,

21  it is the opinion of the Forest Service this is an

22  illegal gathering because it was not permitted, correct?

23       A     Yes.

24       Q     Did you receive applications for permits?

25       A     There was one application that was received at

1     the district commander's office, and it was denied.

2          Q     What reason was that denied?

3          A     There were several reasons, two of which were

4     timeliness of the application, because they were already

5     in excess of 74 people on-site, and also the safety

6     concerns regarding that particular area having large bark

7     beetle damage and being an area of -- composed of a lot

8     of dead trees.

9          Q     So let's go back to that timeliness concern.

10    So what you're saying is that an application submitted

11    after there are already 75 people on the land is denied?

12         A     It's up to the forest supervisor to deny or

13    accept the -- the application and permit.

14         Q     But this year the application was denied for

15    that reason, among other reasons?

16         A     That was one of the reasons, yes.

17         Q     Were those reasons communicated in writing to

18    the Rainbow Family?

19         A     I believe there was a copy of the denial

20    letter returned to the individual that submitted the

21    application.

22         Q     And who submitted the application?

23         A     I don't know his name.

24         Q     Were there other applications submitted after

25    that time?                                      000042

A    I do not believe so.  I think some people came

2    and tried to talk about an application for that

3    particular area, and because of the same concerns

existing over the timeliness and the concern with fires,

5    that the applications were not accepted for that

6    particular area.

7    Q    So during -- I'm sorry.

8    MR. SOWKA:  Your Honor, if I may have a

9    moment?

10    THE COURT:  Sure.

11    Q    (By Mr. Sowka)  So was -- was the defendant at

12    any time offered the chance to sign a permit application?

13    A    Was the defendant?

14    Q    At any time offered the chance to sign a

15    permit application?

16    A    You?

17    Q    Yes.

18    A    You, the defendant?  I don't know.  I don't

19    know.

20    Q    Were others who requested a permit application

21    given that application by the Forest Service officers at

22    the informational checkpoints?

23    A    As far as the application?  No, they weren't

24    provided an application.  They were instructed how they

25    could get -- get one.                                000043

Q    So let me -- let me go back to repeat on that.
You said they were instructed by the informational
officers how they could get an application?

A    Some of the officers, I believe, were called
to instruct people if they wanted to apply for a permit
at another location, an additional location other than
that particular one, they could respond to the district
8   commander's office and get an application for a permit.

Q    And --

10   A    There were --

11   Q    Go ahead.  I'm sorry.

12   A    There were a couple of individuals I know that

13   came in to inquire about a permit, but they -- whether or

14   not -- or an application for a permit, but whether or not

15   they got one, I don't know.

16   Q    And at the informational checkpoints, were

17   members of the Rainbow Family or attendees of the

18   gathering offered the reason for denial for the

19   application?

20   A    As far as what the officers were telling

21   people who drove up, if you showed up, they were informed

22   that it was an illegal gathering that was taking place,

23   and a permit had not been issued for a particular

24   location, and they were given the opportunity to turn

25   around.                                    000044

34

1        Q    And what control do these individuals have

2  over the number of other individuals attending?

3        A    I don't know that they have any control.

         Q    So it sounds to me, and tell me if I'm

5  correct, like the only way of avoiding the ticket was

6  leaving the area.

7        A    If you proceeded into the area that was the --

8  where the illegal gathering was occurring, yes, you had

9  to leave the area.

10       Q    So these individuals that arrived after there

11  were already 75 people on-site were not given permit

12  applications.  They were not given -- they had no control

13  over other people that were at the site, so their only

14  recourse was to leave the area, to avoid --

15       A    What happened is they come -- once they go to

16  that checkpoint, and they're informed, if they continue

17  on, they could receive a violation notice.  They're given

18  the opportunity to turn around at that point.

19        If they choose to continue in, the officers

20  that are doing the foot patrols were still continuing to

21  provide information that it was an illegal gathering and

22  warn people that they're subject to a violation notice if

23  they come in.

24       Q    All right.  Okay.  Next we're going to move on

25  to enforcement tactics.  Oh, as commander of the incident

000345

1     management team, I -- I take it you have a certain amount

2     of leeway over determining what kind of tactics are used

3     in enforcement.

4          A     Yes.

5          Q     Was it your decision to use intimidation

6     tactics in enforcing the tickets?

7          A     I don't know that we were using intimidation

8     tactics.

9          Q     So we're going to talk about that first

10    informational checkpoint that was placed up.  At that

11    checkpoint, was traffic blocked from going through?

12         A     Yes.

13         Q     So would it be fair to refer to that one as

14    opposed to the other one as a road block?

15         A     Yeah.  It's called a safety information

16    checkpoint.

17         Q     So how do we differentiate between one that

18    does allow traffic through and one that does not?

19         A     That particular checkpoint was set up because

20    there was an illegal gathering occurring, and the Forest

21    Service does not have to allow to let that illegal

22    gathering to continue.

23              To give you an example, if you were out bear

24    hunting or doing some type of hunting, and you were

25    issued a violation notice for taking illegal game, the

J 0 0 0 4 6

officer doesn't issue the violation notice to you and

2    then say, Continue on with shooting illegal game.

3            So whenever you pull up to that checkpoint,

4    and you're given the opportunity to turn around, if you

5    continue into that area, you can find -- you actually are

6    subject to a violation notice.  As long as you remain in

7    that area of illegal gathering, you are subject to a

8    violation notice.

9        Q    And at that information checkpoint, the first

10   one, during which traffic was abated, do you recall

11   receiving a call from the officers on-site that a supply

12   vehicle would be allowed to pass through with food after

13   being ticketed?

14       A    I don't recall (inaudible).

15       Q    Okay.  So back to these tactics that aren't

16   intimidation tactics.  Did you -- did you authorize

17   patrols of up to ten to 16 officers to ticket

18   individuals?

19       A    Yes.  What I had instructed the officers to

20   do, just for their safety and their well-being, is that

21   if they would like to patrol areas where there is a

22   larger number of them to patrol in an area, so they could

23   spread out, yes.

24       Q    Did you authorize the use of aircraft?

25       A    No.

000047

         Q     Did you authorize officers to carry assault
rifles on their chest?

         A     On their chest?  Each officer is issued a
shotgun, an AR-15, a Colt AR-15, and it's up to that
officer on how that weapon is deployed.

    6    Q     And did you authorize the use of pepper spray?

    7    A     Again, as part of the officer's safety
equipment, pepper spray is issued to that officer, and

    9    it's up to that individual officer on how that is

   10    deployed.

   11    Q     And after the first initial safety and

   12    information checkpoint that was abating traffic, at

   13    consec- -- or at further checkpoints, did you authorize

   14    the random searches of vehicles?

   15    A     Authorize of -- it's up to that officer to

   16    note probable cause before a vehicle is searched.

   17    Q     But you did authorize canine units on the

   18    ground to walk around every car.

   19    A     Again, it's up to the canine officers to note

   20    probable cause before searching a vehicle.

   21    Q     But you did authorize that canines be deployed

   22    on the ground, walking around every car that went out.

   23    A     If there was canine units that are authorized

   24    to be in that area, that is up to that officer to

   25    determine probable cause before walking around a car.

       Q    So to sum up on these tactics that were not

2   intimidation tactics, you authorized checkpoints that

abated traffic, patrols of ten to 16 people to ticket

individuals, the use of -- the carrying of assault

5   rifles, the use of pepper spray and searches by canine

6   officers at entry points at the site.

       A    Yes.

8        Q    Is it true that you were targeting

9   infrastructure, supply vehicles, medical personnel?

10       A    No.

11       Q    Reminding Mr. Lynn that he's under oath --

12        THE COURT:  Let's keep it to the questions.

13   Okay?

14        MR. SOWKA:  Sorry, Your Honor.

15        UNIDENTIFIED MALE SPEAKER:  (Inaudible) you're

16   under oath.

17       Q   (By Mr. Sowka)  And so you did not -- so you

18   had no knowledge that supply vehicles were detained?

19       A    That particular one that you're mentioning,

20   no.  I do not have knowledge of any particular supply

21   vehicle that was detained.

22       Q    And now, earlier -- I am just going to bring

23   up something from --

24        MR. SOWKA:  And I'm almost finished, Your

25   Honor.

Q     (By Mr. Sowka)   But I'm just going to bring up something from -- that I saw in the last trial.   At first, there was a blanket ticketing that was going on, correct, everybody in A Camp and that, after that, the Forest Service changed tactics to selective ticketing; is this correct?

A     No.

Q     Why was the order for blanket ticketing withdrawn?

A     The -- because of the safety concern for the officers and the personnel that are there, the Forest Service is always changing how we do things operationally, as a concern for the safety of not only the officers, but for the participants.

So if it's -- if we feel it is safe to go into an area and because of everyone there, because the numbers are of a particular size that we feel it's safe for all those concerned, then, yes, that's how we do that.   But if there's more participants, that we feel it's not safe, then we change how we do ticketing.   Yes.

Q     Okay.   Well, for safety reasons, did you withdraw the blanket ticketing or . . .

A     It was up to the officers to walk through, and they make their own determination on who gets a ticket.

Q     And what guidelines do you offer to your

officers for this determination?

A     They walk through.  If they have individuals there that they feel meets certain guidelines for

4    probable cause, to get a violation notice, they issue them a ticket.

Q     And what are those guidelines?

A     Are you participating in an illegal event?

8    Q     But -- however, they do have the legal leeway

9    to ticket one person in the car and not everyone else in

10   the car?

11   A     It's up to that particular officer.

12   Q     And leeway to ticket one person in a crowd and

13   not anybody else in the crowd?

14   A     Again, it's up to that individual officer.

15   Q     And what would prevent them from using

16   prejudicial reasons to ticket one person over another

17   based on race or religion or creed?

18   A     I believe that the officers that were out

19   there had attended ethics training, that is a requirement

20   with the Forest Service, and they do not specifically

21   target people because of their religion or race.

22   Q     So it's your belief that the training prevents

23   people from doing this?

24   A     It's -- as far as -- the Forest Service

25   provides that training, but then the officer -- hopefully

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329 FAX (720) 449-0334