1    that training has helped them in determining that they

2    don't need to separate or -- or pick out particular

3    people due to race or religion.

4         Q    And is there any -- I'll withdraw the

5    question, Your Honor.

6              MR. SOWKA:  I have no more questions.

7              THE COURT:  Okay.  Thank you.  Any other

8    questions for this witness?

9              MR. NASRULLAH:  Your Honor, just a couple.

10                   REDIRECT EXAMINATION

11   BY MR. NASRULLAH:

12        Q    In the past, has the Rainbow Family obtained

13   a permit for these gatherings, to your knowledge?

14        A    Yes.

15        Q    What years was that?

16        A    That was in 2003, 2004 and 2005.

17        Q    And you talked about some safety concerns that

18   lets -- that lets the denial of this permit thing that is

19   requested once the gathering is started, correct?

20        A    Yes.

21        Q    Can you describe those concerns for us?

22        A    Those concerns are -- the Rainbow Family of

23   Living Light -- again, this year, in 2004, the Rainbow

24   Family of Living Light, in Region 5, which is California,

25   provided 13 locations throughout the state of California

000052

1    for suitable locations.

2            During that time, the Rainbow Family of Living

3    Light did not confer with the Forest Service and landed

4    in an area that landed on tribal ceremonial burial

5    grounds that became a concern for the tribes, the Plains

6    Tribe and the Pitburger Tribe (phonetic) of Northern

7    California.

8            Last year, 2005, again, the Rainbow Family was

9    provided five locations along the Atomahele (phonetic)

10   National Forest, and they chose not to attend or have

11   their gathering on one of those five locations and landed

12   in an area that had resource -- research plots that were

13   there, multi-year research plots, and five T and E,

14   Threatened and Endangered species.  So that year that

15   particular application was denied for that location.

16           And then this year the Rainbow Family of

17   Living Light was provided three locations on the Routt

18   National Forest, of which this location was not one of

19   those three.

20           And they have landed in an area that is a high

21   safety concern because it's 70 percent dead, which is a

22   high fire danger, as a cause of concern for the

23   participants.

24           MR. NASRULLAH:  Nothing further.

25           THE COURT:  Okay.  Any other questions?

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329 FAX (720) 449-0334

```
1              MR. SOWKA:  Just --

2              THE COURT:  Just based on those questions.

3              MR. SOWKA:  Yes.  Right.

4                   RECROSS-EXAMINATION

5    BY MR. SOWKA:

6         Q    Do you know -- do you know when the Rainbow

7    Family got started annually?

8         A    I believe 1972.

9         Q    But yet there were only three years where it

10   was permitted?

11        A    As I'm aware, 2003, four and five.

12        Q    And during last year's gathering, did the

13   gathering participants -- did the gathering participants

14   move the gathering based on the Forest Service making

15   known the resource issues?

16        A    Yes.

17        Q    And are you aware of the special needs of the

18   Family for sites of large meadows, clean water sources,

19   access roads?

20        A    Yes.

21        Q    And you feel that all of the sites recommended

22   had those amenities?

23        A    I believe the range of district this year of

24   the site that they had provided did have those --

25   addressed those concerns.
```

000054

1      Q    And the site last year, did it have a road

2 going through the center of Main Meadow?

3      A    It had one road that led in, yes.

4      Q    Going through --

5      A    I didn't know -- it didn't go all the way

6 through Main Meadow, no.

7           MR. SOWKA:  All right.  No more questions.

8           THE COURT:  All right.  Any other questions?

9           MR. NASRULLAH:  No.

10          THE COURT:  Mr. Lynn, you can have a seat.

11 Government's next witness.

12          UNIDENTIFIED MALE SPEAKER:  (Inaudible.)

13          MR. NASRULLAH:  Your Honor, the government

14 calls Officer Croakstead (phonetic).

15          THE COURT:  Sir, if you'd raise your right

16 hand.  Under the penalty of perjury, solemnly swear the

17 testimony you're about to give is the truth, the whole

18 truth and nothing but the truth?

19          THE WITNESS:  (Inaudible.)

20          THE COURT:  Please have a seat.  State your

21 name and your occupation.

22          THE WITNESS:  Jan Croakstead.  (Inaudible.)

23          THE COURT:  Mr. Nasrullah, your witness.

24          MR. NASRULLAH:  Yes, sir.

25 //

000055

                        DIRECT EXAMINATION

BY MR. NASRULLAH:

    Q    When did you arrive in Colorado?

    A    (Inaudible.)

    Q    Where did you come from?

    A    Gallatin National Forest, Montana.

    Q    And what was the purpose of your arriving in Colorado?

    A    Purpose was to assist with the incident management team with the Rainbow Family gathering.

    Q    And you've been here -- and you've been in Colorado since then, continuously?

    A    Yes.

    Q    And could you describe for the Court the contact you had with this particular defendant?

    A    Yes, sir.  First, myself and the other Forest Service officers were on patrol in the Big Red Forest area (inaudible).  And we just were out through the trees, making contact (inaudible), up above (inaudible).

        MR. NASRULLAH:  Okay.  Your Honor, if there's no objection, could he point that out on -- on the overhead?

        THE COURT:  Any objection?

        MR. SOWKA:  No objection, Your Honor.

        THE COURT:  Sure can.

000056

1          THE WITNESS:  It's here, right up in this

2    area, right up in here (inaudible).

3          Q     (By Mr. Nasrullah)  And who of the three

4    forest -- other Forest Service officers were with you?

5          A     Officer Jody Freud (phonetic), Officer Jason

6    Tactis (phonetic), Officer Reese -- Weese, Weese

7    (phonetic).  I believe Mr. Weese is not present today,

8    sir.

9          Q     And what time did this contact take place?

10         A     (Inaudible.)

11         Q     Or if I hand you a copy of the ticket, would

12   that refresh your recollection?

13         A     Yes, sir.

14         MR. NASRULLAH:  Your Honor, may I?

15         THE COURT:  Sure.

16         THE WITNESS:  Approximately 1800 -- 1800

17   hours, six -- 6:00 o'clock in the afternoon.

18         Q     (By Mr. Nasrullah)  At that point, did you

19   talk with the defendant?

20         A     Yes, sir.

21         Q     And what -- can you describe those

22   discussions, please.

23         A     (Inaudible) a couple of other violation

24   notices were written at the time, one to a -- I believe

25   it's his wife and another individual that was cited for

000057

1    possession of marijuana and a Mr. Sowka (phonetic) --

2        Q    Sowka (phonetic)?

3        A    Sowka was present.  He -- he came up after the

4    first of the tickets were written.

5        Q    Just for the record, could you identify the

6    defendant.

7        A    Yes, sir.  It's the gentleman with the -- has

8    the dark-colored, tie-dyed corduroy pants, blond hair, in

9    the front row.

10            MR. NASRULLAH:  Your Honor, can I ask the

11   record to reflect the in-court identification of the

12   defendant?

13            THE COURT:  It will.

14       Q    (By Mr. Nasrullah)  So you were writing some

15   tickets to some other individuals, and the defendant

16   showed up?

17       A    Yes, sir.  Officer Crune (phonetic) was

18   writing one -- one violation notice, and I don't recall

19   if it was before or after I had contact with this

20   gentleman, when I wrote a possession-of-marijuana ticket.

21       Q    Did you write the defendant a ticket that day?

22       A    Yes, sir.

23       Q    And what was the ticket that you wrote?

24       A    A ticket for use of national forest land

25   without a permit.

                                        000058

1      Q    And was he located in the Routt National

2   Forest at this time?

3      A    Yes, sir.

4      Q    Within the gathering that you described on

5   Exhibit 3?

6      A    Yes, sir.

7      Q    Which was the Rainbow gathering?

8      A    Yes, sir.

9      Q    And did the defendant make any statements at

10  the time you had contact with him and wrote him the

11  ticket?

12     A    The defendant explained to me that he was glad

13  to see what -- he wanted me to write him a ticket.

14  Officer Crune had one violation notice at the time, and

15  he wanted me to write the ticket to him based on some

16  earlier contact that I had with this man.

17     Q    Did he say why he wanted you to write the

18  ticket to him?

19     A    Prior to my contact, three days prior,

20  Mr. Sowka was out here in the yard, and he explained to

21  me that -- when I saw him in the gathering, he wanted me

22  to write him a ticket.

23     Q    And you did?

24     A    (Inaudible.)

25     Q    Did he make any other statements?    000059

1      A      Yeah.  What I write -- after I wrote the

2  ticket, Mr. Sowka wanted to review and make sure that I

3  got everything correct.

4      Q      And did he accept the ticket?

5      A      Yes, sir.  He reviewed it and said, Oh, it

6  looks good.  It didn't look like it was going to be this

7  good.

8              UNIDENTIFIED MALE SPEAKER:  Do I have anything

9  else to say?  No.

10             MR. NASRULLAH:  Nothing further, Your Honor.

11             THE COURT:  Okay.  Thank you.  Mr. Sowka,

12  anything further for this witness?

13             MR. SOWKA:  Absolutely, Your Honor.

14                    CROSS-EXAMINATION

15  BY MR. SOWKA:

16     Q      So, back to that day, the 1st of July.  I want

17  to take you a little bit before the contact.  You had

18  mentioned that you had contacted a woman that you believe

19  is my wife?

20     A      Yes, sir.

21     Q      At that time, how many officers were with you?

22     A      Three other officers.

23     Q      And was -- how many other attendees of the

24  gathering were around at this time, if you would

25  estimate, attendees of the gathering, if you could

000060

50

1    estimate?

2         A    Attendees of your gathering?

3         Q    How many other nonForest Service personnel,

4    people that were not with your group, were there present

5    within your sight at that time, if you could estimate?

6         A    Oh, I -- I'd estimate that there were 12 or 15

7    people standing throughout the woods, possibly more.

8         Q    Okay.  And did you ticket any of them?

9         A    I didn't ticket anyone in particular for

10   occupancy out -- use of the national forest land without

11   a permit at that time.

12        Q    Did your group approach and ticket any of

13   them?

14        A    Yes, sir.

15        Q    And how many of those 12 to 15 were ticketed

16   by your group?

17        A    Two.

18        Q    And those two were the -- the woman that you

19   alleged to be my wife and another --

20        A    Yes, sir.

21        Q    Another person?  So do you remember what -- do

22   you remember why you selected out the second person, the

23   male, and ticketed that person?

24        A    Yes, sir.

25        Q    Why did you select him out?

                                        000061

1      A     I saw what appeared to be a marijuana pipe out

2 of his pocket.

3      Q     Okay. And so now, enough of that. Back to

4 our contact. Did I approach the group of officers during

5 the ticketing of another individual?

6      A     You didn't approach real close, sir.

7      Q     Did I stop the appropriate 14-foot distance

8 and sit down?

9      A     I'm not sure there's an appropriate distance,

10 sir.

11      Q     So you wouldn't say that I was in any way

12 interfering with the ticketing of another?

13      A     If you were interfering, I would let you know,

14 sir.

15      Q     Thank you. And at the time of our contact,

16 was I searched by the officers?

17      A     I'm not well aware of that, sir.

18      Q     Did one of the officers take from my knife --

19 take from my belt a pocket knife and hold onto it?

20      A     It would be possible, sir.

21      Q     You didn't witness me being searched?

22      A     I'm not sure, sir.

23      Q     Was any contraband found on my person?

24      A     Not to my knowledge, sir.

25      Q     And was I, to your knowledge, in violation of

000062

1    any law other than CFR261.10K?

2         A    At the time, no, sir.

3         Q    At any time during your patrolling of the

4    gathering, did you witness me in any -- in violation of

5    any law other than 261.10k?

6         A    Yes, sir.

7         Q    And when was that?

8         A    I don't remember the date, sir.  I believe you

9    were present in a van where marijuana was present.

10        Q    You believe I was present in a van where

11   marijuana was present?

12        A    If you weren't there at that time, sir, I

13   stand corrected.

14        Q    Well, either I was there, or I wasn't there.

15   Which is it?

16        A    Yeah.  I remember seeing you at another time,

17   sir.  And I'm just saying I may stand corrected.

18        Q    All right.

19             MR. SOWKA:  One moment, Your Honor.

20        Q    (By Mr. Sowka)  Back to the contact with the

21   woman alleged to be the defendant's wife, did she make

22   any gesture or statement that would make her appear

23   threatening to the officers?

24        A    No, sir.

25        Q    Was she bearing any weapon?          000063

53

1          A      No, sir.

2               MR. SOWKA:  I have no further questions, Your

3     Honor.

4               THE COURT:  Okay.  Any other questions of this

5     witness?

6                        REDIRECT EXAMINATION

7     BY MR. NASRULLAH:

8          Q      Just so that we're clear, Officer, the -- the

9     ticket written based on 36CFR261.10K was written on

10    July 1 --

11         A      Yes, sir.

12         Q      -- 2006?  Thank you.

13              MR. NASRULLAH:  Nothing further, Your Honor.

14              THE COURT:  Okay.  Thank you.  You can have a

15    seat.  Next witness.

16              MR. NASRULLAH:  Your Honor, we don't have any

17    more witnesses.

18              THE COURT:  Okay.  Now, Mr. Sowka, you can

19    call witnesses if you would like.  One option you have is

20    to call yourself as a witness, but you have absolutely no

21    obligation to call yourself as a witness, as you have a

22    right to remain silent.  Do you understand all of that?

23              THE WITNESS:  I understand, Your Honor.

24              THE COURT:  Okay.  Any witnesses?

25              UNIDENTIFIED MALE SPEAKER:  Your Honor, I

000064

1    would ask that the Court take a short recess, if that

2    would be okay, so I can use the restroom facilities.

3                THE COURT:  We can take a very brief recess.

4                UNIDENTIFIED MALE SPEAKER:  Thank you.

5                (A recess was taken.)

6                THE COURT:  Okay.  All right.  We're back on

7    the record concerning Mr. Sowka.  And, Mr. Sowka, your

8    first witness.

9                MR. SOWKA:  I would like to call Christine

10   Sowka.

11               THE COURT:  Raise your right hand, please.

12   Under penalty of perjury, solemnly swear the testimony

13   you're about to give is the truth, whole truth, nothing

14   but the truth?

15               THE WITNESS:  (Inaudible.)

16               THE COURT:  Please have a seat.  State your

17   name and your residence.

18               THE WITNESS:  My name is Christine Sowka.

19   (Inaudible.)

20               THE COURT:  Mr. Sowka, questions.

21                      DIRECT EXAMINATION

22   BY MR. SOWKA:

23        Q    Mrs. Sowka, have you had contact with the law

24   enforcement officers in the vicinity of the Routt

25   National Forest?                          000065

1      A     Yes.

2      Q     And, now, reminding you that we're speaking

3  about law enforcement officers and not resource

4  personnel, how many separate occasions have you had

5  contact with these officers?

6      A     (Inaudible.)

7      Q     Four, notably?  Is it four, or is it three?

8      A     Three, notably (inaudible).

9      Q     Okay.  So we're going to discuss your first

10 contact with the law enforcement officers.  When did this

11 take place?

12     A     On July 21st of this year.

13     Q     And where did this take place?

14     A     At the intersection of 505 and 500

15 (inaudible).

16          MR. SOWKA:  And if there's no objection, might

17 I have the witness point to the location on the map?

18          MR. NASRULLAH:  Objection, Your Honor.

19          THE COURT:  I'm having trouble as to the

20 relevance.

21          MR. SOWKA:  Your Honor, this defense is based

22 on the religious freedom information -- Freedom

23 Restoration Act.  And it falls to the defense to prove

24 substantial burden, and so the witness is being asked to

25 substantiate harassment tactics and also to refute

1   statements made under oath by the prosecution's

2   witnesses.

3           THE COURT:  Well, I'll let you get started on

4   it.  I'm not convinced of the relevancy at this point.

5           MR. SOWKA:  I'll try and make it brief, Your

6   Honor.  So withdraw the -- the suggestion that she point

7   to the location on the map.

8       Q    (By Mr. Sowka)  At this time, were you driving

9   a supply vehicle --

10      A    I was.

11      Q    -- for (inaudible)?  And the purpose of the

12  supply vehicle?

13      A    It's called main supply.  It's the -- one of

14  the Magic Hats.  It takes all the money that the families

15  have donated to get supplies to feed everybody

16  (inaudible).

17      Q    So the purpose of this trip, when you were

18  contacted by officers, was to procure food for members of

19  the Rainbow Family?

20      A    Yes.

21      Q    And during this contact, was your vehicle

22  stopped?

23      A    Yes.

24      Q    Did you tell the officers that you were

25  bringing food to the families?

000067

```
1        A    Yes.

2        Q    And during this contact, was the vehicle

3   searched?

4        A    Yes.

5        Q    Were you detained during this contact?

6        A    I was detained.

7        Q    How long were you detained?

8        A    Three hours.

9        Q    How many people were in the vehicle with you?

10       A    Three.

11       Q    And how many off- -- three, including

12   yourself?

13       A    (Inaudible.)

14       Q    And how many officers were present during the

15   detainment?

16       A    Seven to ten, somewhere in there.

17   (Inaudible.)

18       Q    And during the detainment, were you removed

19   from the vehicle?

20       A    Yes.

21       Q    And were you forced to stand?

22       A    Yes.

23       Q    For how long?

24       A    I was forced to stand for roughly 45 minutes

25   before I was instructed to sit.
```

000068

1       Q   And were you allowed to shift positions or

2  lean against any objects during that time?

3       A   (Inaudible.)

4       Q   What happened when you attempted to shift

5  positions?

6       MR. NASRULLAH:  Your Honor, I don't think

7  there's any relevance established as to this particular

8  ticket.

9       THE COURT:  Mr. Sowka?

10      MR. SOWKA:  Your Honor, Rainbow Family

11  participants, admitted into the evidence earlier, are

12  practicing a sincere religious belief and being subject

13  to having infrastructure targeted and being subject to

14  harassment, especially physical harassment, is part of a

15  certain burden placed on participants by the government

16  via the enforcement of the statutes in question.

17      THE COURT:  Okay.  I don't see, at this point,

18  how -- pursuant to Rule 402 of the Rules of Evidence,

19  which goes to relevancy, I do not see how this is

20  relevant to the citation and violation notice that you

21  received on July 1, 2006.

22      MR. SOWKA:  Very well, Your Honor.  I will

23  refrain from further questions, although I would like to

24  bring up one statement that refutes an officer's

25  statement earlier.

000069

1           THE COURT:  Sure, or you can ask another

2    question.

3           Q    (By Mr. Sowka)  Very well.  Enough about those

4    first two contacts.  What was the date of your third

5    contact with the officers?

6           A    July 1st.

7           Q    And would you say that you were the person

8    mentioned by the officer as alleged to be the wife of the

9    defendant?

10          A    Yes.

11          Q    And, at that time, how many officers detained

12   you?

13          A    I believe there were approximately ten.

14          Q    And were you present during my interaction

15   with the officers?

16          A    I was.

17          Q    And was I searched at that time?

18          A    Yes, you were.

19          Q    And did the officer take and hold a pocket

20   knife --

21          A    Yes.

22          Q    -- during the search?  Was any other

23   contraband found on my person?

24          A    (Inaudible.)

25          Q    Do you recall the incident that Officer

000070

1   Tackbrass (phonetic) was speaking of when he was talking

2   about contraband being found in a vehicle?

3           A    I believe I can assume that he was referring

4   to the initial search which the prosecution (inaudible).

5           Q    And was I in the vehicle at that time?

6           A    You were not.

7           MR. NASRULLAH:  Your Honor, I object on

8   relevance because she's --

9           THE COURT:  I agree.  I don't see how that

10  alleged van incident has anything to do with this

11  July 1st charge.

12          MR. SOWKA:  That was my last question,

13  Officer, but in the defense of relevance, I would like to

14  say that pointing out a witness's -- a witness not being

15  sure about information he's testified to and pointing out

16  a witness being incorrect or blatantly wrong about

17  information he's testified to is relevant as to the

18  ability of that witness to testify, as of the relevance

19  of that witness's testimony.

20          THE COURT:  I understand your -- your

21  statement and -- but I still -- my ruling stands.

22          MR. SOWKA:  Very well, Your Honor.

23          Q    (By Mr. Sowka)  I -- did you arrive at the

24  Routt National Forest with the defendant?

25          A    Yes.

000071

1           Q       And what was the purpose of that trip?

2           A       For prayer and mediation.

3                   MR. SOWKA:  I have no more questions, Your

4      Honor.

5                   THE COURT:  Okay.  Excuse me a minute.  Any

6      questions?

7                   MR. NASRULLAH:  No questions, Your Honor.

8                   THE COURT:  Thank you very much.  Now you can

9      have a seat.  Next witness.

10                  MR. SOWKA:  The defense next would like to

11     call Rob Savoye.

12                  THE COURT:  Mr. Savoye, raise your right hand.

13     Under penalty of perjury, solemnly swear the testimony

14     you're about to give is the truth, the whole truth and

15     nothing but the truth?

16                  THE WITNESS:  Sure.

17                  THE COURT:  Please have a seat.  State your

18     name and where you reside.

19                  THE WITNESS:  I'm Rob Savoye.  (Inaudible.)

20                  UNIDENTIFIED MALE SPEAKER:  Your Honor, I have

21     filed a notice of appearance for Mr. Savoye, accused of

22     an ecocrime.  I think it's important for the Court to

23     caution Mr. Savoye about rights of self-incrimination.

24                  THE COURT:  Uh-huh.  You are a defendant, I'm

25     assuming, listed on this afternoon's docket.  You clearly

000072

1   need to understand you have a constitutional right to

2   remain silent, whether it's this case or another case, if

3   it has anything to do with your case.

4             THE WITNESS:  I believe the question is

5   (inaudible) with this case.

6             THE COURT:  But you, nevertheless, have a

7   right to remain silent.  And do you understand that?

8             THE WITNESS:  I understand that.

9             THE COURT:  And do you wish time to talk to

10  counsel before -- your counsel before you answer any

11  questions?

12            THE WITNESS:  (Inaudible.)

13            THE COURT:  Do you want -- my question is, Do

14  you want time to talk to your lawyer right now?

15            THE WITNESS:  My lawyer is (inaudible).

16            THE COURT:  Your lawyer is seated right here.

17            UNIDENTIFIED MALE SPEAKER:  Go ahead.

18            THE WITNESS:  Okay.  (Inaudible.)

19            THE COURT:  Okay.  Thank you.  Questions for

20  this witness.

21                      DIRECT EXAMINATION

22  BY MR. SOWKA:

23       Q    Mr. Savoye -- Mr. Savoye, I will be careful to

24  avoid temptations for self-incrimination.  I understand

25  you have some experience with the Rainbow Family of

000073

1    Living Light.  How long have you been involved?

2         A    I've been attending the gatherings since 1980.

3         Q    So 26 years?

4         A    Yes, something like that.

5         Q    And would you agree with what Mr. Lynn said,

6    that there have been only three permitted gatherings?

7         A    If you can contest on the record, that is

8    incorrect.  There have been three permitted gatherings

9    recently, but I believe the historical record shows that

10   there are (inaudible).

11        Q    And have you been -- have you been in

12   attendance of gatherings that were not permitted other

13   than -- well, have you been in attendance of gatherings

14   that were not permitted in the past?

15        A    Yeah.

16        Q    And was the Forest Service simply absent?

17        A    (Inaudible.)  No, they weren't absent.  It was

18   mainly just a few resource people (inaudible).

19        Q    And were there -- was there a gross resource

20   damage or loss of life or limb at these gatherings?

21        A    Not that I can recall.

22        Q    Were there policies in place to assist

23   cooperation between the law enforcement resource -- law

24   enforcement, slash, resource people and the Family?

25        A    Typically, in the past, there was a mutual

000074

1   operating plan worked out, where we -- for a week or ten

2   days between people concerned and the rehabilitation

3   resource people about the proper restoration of the site

4   and the grading on the roads and trails and things that

5   needed to be restored and the things that didn't need to

6   be and that kind of deal.  And I believe the operative

7   plan was used for many, many, many years to deal with

8   rehabilitation.

9        Q    And in your experience at these gatherings,

10  did the operating plan successfully deal with restoration

11  of resource issues?

12            MR. NASRULLAH:  Objection, your Honor.  It's

13  asking for his personal opinion.

14            THE COURT:  I'm going to allow his question

15  and answer.

16            THE WITNESS:  Actually, because I have

17  a very-much collection of the official chain of letters

18  from the Forest Service, and they have always stated that

19  the conditions of the operating plan have always been

20  (inaudible).

21       Q    (By Mr. Sowka)  And you operate

22  welcomehome.org?

23       A    Yeah, I own and operate it.

24       Q    And on this website, you do have a collection

25  of documents from the Forest Service as to how things

000075

1   have worked out in the past?

2       A    Yeah.  I have a very-much collection of the

3   chain of letters from the Forest Service, and they have

4   always stated that all the conditions of the operating

5   plan and rehabilitation plan has been met.

6       Q    And during these gatherings where an operating

7   plan was in use, were there evacuation plans in case of

8   fire or disaster?

9       A    The word "plan" is kind of difficult.

10      Q    Were there evacuation procedures that were to

11  be used in case of --

12      A    Typically, the operating plan, to the best of

13  my memory, was specifically focused on rehabilitation and

14  on . . .

15      Q    But were the plans -- not -- not necessarily

16  in the operating plan, but were the plans in place among

17  the family members and among the Forest Service?

18      A    I would imagine that people that deal with

19  forest fires have their own fire plans, just like people

20  that deal with medical stuff have medical plans, but I'm

21  not aware of any specific plan (inaudible).

22      Q    Very well.

23      A    It doesn't mean it doesn't exist.  It's just

24  not . . .

25      Q    Understood.  And in these gatherings in the

000076

1    past, have you yourself assisted in cooperations with the

2    Forest Service?

3           A    Yes.

4           Q    Things like helping them to find fugitives?

5           A    Yes.

6           Q    Helping them to find runaways?

7           A    No.

8           Q    Medical evacuation?

9           A    Yes.  (Inaudible.)

10          Q    And overseeing cleanup, to see that the plan's

11   been met?

12          A    Overseeing the cleanup is kind of involving

13   (inaudible).  I've been here through cleanup because I

14   used to be a professional trail maintenance supervisor,

15   and so I like to put my professional skills to work

16   involving trails, but that's as far as I get.

17          Q    And, in your experience, all trash, trail --

18   all trash will be removed, trails were reseeded?

19          A    No.  I've been back to sites after cleanup and

20   couldn't find a cigarette butt.

21              MR. SOWKA:  I have no further questions, Your

22   Honor.

23              THE COURT:  Okay.  Any questions?

24              MR. NASRULLAH:  No.

25              THE COURT:  Okay.  Thank you, sir.  You can

000077

1   have a seat.

2           MR. SOWKA:  And, as a final witness, I would

3   like to take the stand myself.

4           THE COURT:  Okay.  Sure.

5           MR. SOWKA:  I have one question, first, Your

6   Honor.  I understand that's -- to bring defense exhibits

7   up to you, hand them to the witness.  Is that all right?

8           THE COURT:  Once you give the government your

9   stack, you give me my stack, and you keep your stack.

10          MR. SOWKA:  Will do.

11          THE COURT:  How's that?

12          MR. SOWKA:  Sounds good.  (Inaudible.)

13          THE COURT:  Don't worry.  Thanks.

14          Now, if you raise your right hand.  Under

15  penalty of perjury, solemnly swear that the testimony

16  you're about to give is the truth, whole truth and

17  nothing but the truth?

18          MR. SOWKA:  I do.

19          THE COURT:  Please have a seat and state your

20  name and where you reside.

21          THE WITNESS:  My name is Scott Sowka.

22  (Inaudible.)

23          THE COURT:  Okay.  What would you like to say?

24  //

25  //                              000078

NARRATIVE

1

2  BY MR. SOWKA:

3          I have been attending the Rainbow Family

4  National Regional (inaudible) for six years, and I do so

5  for the purpose of prayer, not just the July 4th prayer

6  circle, but put the purpose of prayer on a daily basis.

7          I know a little bit (inaudible) the nature and

8  types of camps, camps that (inaudible).  The Jesus

9  Kitchen, Shana Cafe (phonetic), the Mohana Cafe

10  (phonetic), the Jerusalem Cafe are groups of people

11  brought together in a religious intent to pray together.

12          And, yes, we have several very unique beliefs

13  in the Rainbow Family, and one of those beliefs is that

14  no person can speak for us as C -- as Exhibits C and D --

15  as Exhibits C and D and another one of those pieces that

16  we need to leave on public land.

17          Now, unlike Mr. Lynn, I can tell you why we

18  hold those beliefs.  It's because in our climate, our

19  (inaudible) climate of religious war, of religious

20  conflict, we believe that giving one person power or

21  giving one group of people power over the assembly,

22  through its contempt, it starts talking.  We have been

23  successful for 35 years of meeting together for religious

24  peace.

25          And we have cooperated with the Forest Service 0 7 9

1    at every turn, whether it be them asking us to move a

2    vehicle, whether it be them asking us to find a fugitive

3    at a gathering.

4         But starting in 1984, the Forest Service

5    started adopting regulations to limit and refuse, and,

6    twice, those regulations were thrown out by the high

7    court.  The regulations started in '84.  That's in one of

8    these defense exhibits, I believe A (inaudible).

9         In '84, they were adopted and thrown out by

10   the high courts because they were unconstitutional.  In

11   '88, they were changed and then thrown out by the high

12   courts because they couldn't show cause why they had to

13   change them.

14        Again, in 1993, right around the same time

15   that our (inaudible) getting back to us by the -- by the

16   legislature, regulations were adopted once again.

17        And, per Exhibit B, those regulations

18   specifically state that no permit can be authorized

19   unless that permit is signed by an individual or a group

20   of individuals representing a whole.

21        Now, you can talk to Rainbow's (inaudible).  I

22   have, myself, conducted many interviews, and nobody,

23   including myself, has any problem with the permit.  We

24   have no problem with the Forest Service (inaudible), but

25   when a part of that permit process forces to us to break

1   our religious views, that determines (inaudible).

2          To back up my case, after all, it's in the

3   photographs, Exhibits E through H.  That's Exhibits E

4   through H.  And if I could identify them real quickly.

5          Exhibit E is a photograph of informational

6   checkpoints where cars that entered were randomly

7   searched without cause.  Had this happening on a city

8   street, the ACLU would be all over it, but it happened in

9   a forest.

10          There were some statements made by the

11  officers.  Exhibit F is a picture of 13 Forest Service

12  officers surrounding and ticketing a single, unarmed man.

13          What you can't see outside of the picture is

14  five armed Forest Service officers standing by, all of

15  them armed.  All of them (inaudible), putting their hands

16  on them physically.

17          And before I go on to more exhibits, one of

18  the things I do with the Rainbow Family is I volunteer to

19  buy first aid.  And this year I provided first aid to

20  people who were beat by the police officers, that did not

21  assault them.

22          I provided first aid to a young woman, under

23  18, who was sprayed in the face with pepper mace because

24  she walked too close.  She was only (inaudible).

25          These assault and two-way tactics should not

000081