

federal register

Wednesday
August 30, 1995

Part III

# Department of Agriculture

Forest Service

36 CFR Parts 251 and 261
Land Uses and Prohibitions; Final Rule

**45258** Federal Register / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Rules and Regulations

**DEPARTMENT OF AGRICULTURE**

**Forest Service**

**36 CFR Parts 251 and 261**

[RIN 0596-AA80]

**Land Uses and Prohibitions**

**AGENCY:** Forest Service, USDA.
**ACTION:** Final rule.

**SUMMARY:** This final rule revises the existing rules governing noncommercial group uses and noncommercial distribution of printed material within the National Forest System. These revisions ensure that the authorization procedures for these activities comply with First Amendment requirements of freedom of speech, assembly, and religion, while providing a reasonable administrative system for allocating space among scheduled and existing uses and activities, addressing concerns of public health and safety, and controlling or preventing adverse impacts on forest resources.
**EFFECTIVE DATE:** This rule is effective September 29, 1995.
**FOR FURTHER INFORMATION CONTACT:** John Shilling, telephone number (202) 205-1426, or Sharon Prell, telephone number (202) 205-1414, Recreation, Heritage, and Wilderness Resources Management Staff (2340), Forest Service, USDA, PO Box 96090, Washington, DC 20090-6090, or Ellen R. Hornstein, telephone number (202) 720-9616, Natural Resources Division, Office of the General Counsel, USDA.

**SUPPLEMENTARY INFORMATION:**

**Statutory and Regulatory Background**

The First Amendment of the United States Constitution provides in part that the government may not abridge the freedom of speech or the right to assemble peaceably and that the government may not pass laws prohibiting the free exercise of religion (U.S. Const., amend. I). Freedom of speech means the right to disseminate ideas freely, both orally or in writing. Free exercise of religion means the right to practice one's religion freely.

It is well established that the government may enforce reasonable time, place, and manner restrictions on First Amendment activities. Such restrictions are constitutional when justified without regard to the content of the regulated speech, when narrowly tailored to further a significant governmental interest, and when they leave open ample alternative channels for communication of information. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 (1984). Permits have been recognized as constitutional restrictions of time, place, and manner for activities involving the expression of views, including religious gatherings, when specific and objective standards guide the licensing authority. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150-51, 153 (1969); *Cantwell v. Connecticut,* 310 U.S. 296, 304-05 (1940).

On March 3, 1891, Congress authorized the President to set aside federal lands as public forest reservations (16 U.S.C. 471). On June 4, 1897, Congress directed the Secretary of the Interior to protect the forests within those reservations and to regulate their occupancy and use (16 U.S.C. 551). On February 1, 1905, Congress transferred the authority to manage the national forest from the Secretary of the Interior to the Secretary of Agriculture (16 U.S.C. 472).

Today there is 155 national forests comprising approximately 191 million acres in 42 States, the Virgin Islands, and Puerto Rico. These forests, together with 20 national grasslands, land utilization projects, purchase units, and other lands, constitute the National Forest System.

The Forest Service, an agency of the United States Department of Agriculture, is charged with managing the resources of the National Forest System for multiple uses as well as for the provision of goods, services, and other amenities for current and future generations. The Multiple-Use Sustained-Yield Act of 1960 (MUSY) (16 U.S.C. 528-531) authorizes the Forest Service to manage diverse public, private, governmental, and commercial uses of National Forest System lands. These uses are collectively known as special uses.

The Forest Service regulates activity on National Forest System lands by issuing special use authorizations. Issuing special use authorizations allows the Forest Service to protect resources and improvements on National Forest System lands, to allocate space among potential or existing uses and activities, and to address concerns of public health and safety. The rules at 36 CFR part 251, subpart B, govern the issuance of special use authorizations for all uses of National Forest System lands, improvements, and resources, except for the disposal of timber (part 223) and minerals (part 228) and the grazing of livestock (part 222).

The Forest Service administers approximately 65,000 special use authorizations annually. Examples of authorized uses include ski resorts and marinas, campground concessions, pipelines, communication sites, and commercial outfitting and guiding services. Competition for available for these uses and activities has increased as more legal restrictions, such as the Endangered Species Act (ESA) (16 U.S.C. 531 *et seq.*) and the National Historic Preservation Act (NHPA) (16 U.S.C. 470 *et seq.*), have been placed on the use of National Forest System lands.

The Forest Service hosts many types of group activities, both commercial and noncommercial, on National Forest System lands. Examples of these activities include fishing contests, mountain bicycle and motorcycle races, group camping, hikes, and horseback rides, and demonstrations and assemblies.

Large group gatherings in the national forests have significant adverse impacts on forest resources, public health and safety, and the agency's ability to allocate space in the face of increasing constraints on the use of National Forest System lands. These adverse impacts include the spread of disease, pollution from inadequate site cleanup, soil compaction from inadequate site restoration, damage to archaeological sites, and traffic congestion.

On June 21, 1984, the Secretary of Agriculture promulgated a revision t 36 CFR part 251, subpart B. The pur of the rule was to allow the Forest Service to protect forest resources, to address concerns of public health and safety, and to allocate space among uses and activities by regulating all types of noncommercial group uses. The rule required a special use authorization for two types of noncommercial group uses, recreation events and special events, both of which involved ten or more participants or spectators. As defined, recreation events included activities involving competition, entertainment, or training, and special events included meetings, assemblies, demonstrations, parades, or other activities involving the expression of views. Noncommercial groups that did not fall into either of these categories did not require a special use authorization. Moreover, the rule contained different standards for denying a special use authorization for each type of group use (49 FR 25449).

Subsequently, a federal district court held that it is unconstitutional to require a group to obtain a special use authorization simply because its members gather to exercise their constitutional right of free speech. The court explained that the Forest Service has the right to regulate large group activities on government land, but on if the regulation is content-neutral an

applies to all large groups. *United States v. Israel*, No. CR–86–027–TUC–RMB (D. Ariz. May 10, 1986).

On May 10, 1988, the Forest Service published an interim rule amending 36 CFR 251.50 through 251.54 to comport with First Amendment rights of assembly and free speech within the National Forest System (53 FR 16548). Upon challenge of this rule, a federal district court held that the Forest Service had failed to show good cause for adopting the interim rule without prior notice as required by the Administrative Procedure Act (APA) under 5 U.S.C. 553. *United States v. Rainbow Family*, 695 F. Supp. 294, 302–06 (E.D. Tex. 1988). In addition, the court invalidated the classification established by the 1984 rule, which on its face singled out group uses involving expressive activities and required that they be treated differently from other types of group uses. The court held that the 1984 rule lacked clear and objective standards for determining when a group activity is a "recreation event" and when it is a "special event" involving the exercise of free speech. *Rainbow Family*, 695 F. Supp. at 309, 312. The court further held that the standards for evaluating an application for an authorization for expressive conduct were unconstitutionally vague as they vested too much discretion in the authorized officer. *Id.* at 309–12. The court also ruled that the 1984 regulations were invalid for failure to impose a timeframe for filing and acting on an application and that the absence of any requirement in the 1984 regulations that a reason be stated for denial of a special use authorization made it impossible to discern the grounds for an authorized officer's decision. *Id.* at 311–12. Finally, the court held that the 1984 rule was invalid for failure to provide for judicial review of the administrative determination. *Id.* at 311.

As a result of these court rulings, on May 6, 1993, the Forest Service published a proposed rule to regulate noncommercial group uses and noncommercial distribution of printed material on National Forest System lands in compliance with First Amendment requirements of assembly and free speech (58 FR 26940). To achieve this goal, the proposed rule contained specific, content-neutral criteria for evaluating applications for noncommercial group uses and noncommercial distribution of printed material and required that the same criteria be applied to those activities regardless of whether they involve the exercise of First Amendment rights. The proposed rule also required an authorized officer to notify an applicant in writing of the reasons for denial of a special use authorization and provided for immediate judicial review of a decision denying an authorization.

In addition to publishing the proposed rule in the **Federal Register**, the Forest Service gave direct notice of the proposed rule to numerous interested parties and invited their comments. The comment period for the proposed rule lasted 90 days, closing August 4, 1993.

**Summary of Comments and Responses**

A total of 603 comments were received during the comment period. Of these, 590 comments were received from individuals, two from elected officials, one from a State department of health, and ten from organizations, including two chapters of the American Civil Liberties Union. Most comments were individually written letters or postcards; several comments were form letters and some were petitions containing 20,451 signatures. All comments have been given full consideration in adoption of this final rule.

**General Comments**

*Comment.* Freedom of Assembly. Approximately 175 respondents stated that requiring permits for expressive activities violates the constitutional right of assembly. Most of these respondents indicated that the First Amendment right of assembly is absolute and that any attempt to regulate assemblies on public land is invalid *per se*. Specific and recurrent comments from these respondents were as follows:

—That the special use authorization requirement in the proposed rule is generally illegal;
—That no possible governmental interest can justify restrictions on free speech;
—That any regulation of First Amendment activities is content-based *per se;*
—That there are no acceptable criteria by which to judge an application for authorization of First Amendment activities;
—That *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), a case cited in the preamble in support of the proposed rule, violates both the letter and spirit of the Bill of Rights;
—That the significant governmental interest standard should not apply because it is too low to justify abridgment of constitutional rights, and that the standards of compelling governmental interest and clear and present danger should apply instead;
—That *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), and *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969), cases cited in the preamble in support of the proposed rule, are too recent and untested;
—That although courts may allow reasonable time, place, and manner restrictions on First Amendment activities, the United States Constitution is still the highest law of the land;
—That the United States Constitution is a permit;
—That humanity is a permit;
—That Americans do not need authorization to exercise basic constitutional rights;
—That the proposed rule imposes a prior restraint and is an undue burden on the public;
—That the Rainbow Family cannot comply with the permit requirement;
—That rights cannot be extinguished by decree of an executive agency;
—That one person should not be able to tell another person what to do;
—That everyone should be able to choose when and where they want to gather on public land and distribute noncommercial printed material;
—That in exercising their First Amendment right of assembly, people should be able to act as they please;
—That national forests should remain open to all;
—That national forests are supported by tax dollars and that taxpayers have a right to gather on public lands;
—That public land belongs to the people and that they should be able to use it without a permit;
—That the proposed rule discriminates against humans, who are given fewer rights than animals to gather in the national forests;
—That assemblies on the national forests provide thousands of people with a fine vacation; and
—That if a similar rule were applied in cities or towns, the rule would amount to imposition of martial law.

*Response.* The United States Supreme Court, the highest court in the country, is the ultimate arbiter of the United States Constitution. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–78 (1803). As noted in the preamble to the proposed rule and the preamble to this final rule, the Supreme Court has repeatedly held that the government may enforce reasonable time, place, and manner restrictions on First Amendment activities. Such restrictions are appropriate where they are content-neutral, where they are narrowly tailored to further a significant

**45260** Federal Register / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Rules and Regulations

governmental interest; and where they leave open ample alternative channels for communication of information. *Clark* v. *CCNV*, 468 U.S. at 293. Permits have been recognized as constitutional restrictions of time, place, and manner for expressive activities when specific and objective standards guide the licensing authority. *Shuttlesworth*, 394 U.S. at 150–51, 153. Both *Clark* v. *CCNV* and *Shuttlesworth* involve time, place, and manner restrictions on demonstrations in urban areas. *Clark* v. *CCNV* has been cited nearly 400 times by numerous courts, including over 40 times by the Supreme Court. *Shuttlesworth* has been cited over 600 times by numerous courts, including over 50 times by the Supreme Court. These cases have been extensively tested.

The final rule meets the constitutional requirements of *Clark* v. *CCNV* and *Shuttlesworth*. The final rule does not restrict, and is not intended to restrict, freedom of thought or expression, nor does the final rule prohibit expressive activities. Rather, the final rule establishes a permit system with specific and objective standards that further the significant governmental interests of resource protection, allocation of space in the face of greater restrictions on the use of public land, and promotion of public health and safety. The final rule presumes that a special use authorization will be granted and restricts the content of an application to information concerning time, place, and manner for activities subject to the rule. Under the final rule, if an application is denied and an alternative time, place, or manner will allow the applicant to meet the evaluation criteria, the authorized officer must offer that alternative.

*Comment: Free Exercise of Religion.* Forty-eight respondents commented that the proposed rule infringes on the free exercise of religion. Specifically, these respondents stated that permits are unconstitutional as applied to religious activity, citing *Shuttlesworth* and *Cantwell*; that Rainbow Family Gatherings are protected under the free exercise clause of the United States Constitution; that Rainbow Family Gatherings involve the exercise of religion; that Rainbow Family Gatherings are a religious experience; that Rainbow Gatherings provide spiritual growth; that the woods are the Rainbow Family's church; that people choose to gather with those of similar religious beliefs in the cathedral of nature; that the proposed rule would restrict gatherings for the purpose of spiritual expression; that the proposed rule targets those who go to the forest to worship; and that, to many, particularly Native Americans, public land includes sacred ground.

*Response.* The final rule does not infringe and is not intended to infringe upon the free exercise of religion. Under *Shuttlesworth* and *Cantwell*, permits have been recognized as constitutional restrictions of time, place, and manner for activities involving the expression of views, including religious gatherings, when specific and objective standards guide the licensing authority. 394 U.S. at 150–51, 153; 310 U.S. at 304–05. In *Cantwell*, the Supreme Court stated that the regulation of solicitation generally in the public interest is constitutional where the regulation does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, even if the collection is for a religious purpose. The Court held that this type of regulation does not constitute a prohibited prior restraint or impose an impermissible burden on the free exercise of religion. *Id.* at 305.

Similarly, this final rule is a general regulation in the public interest, does not involve any religious test, and does not unreasonably obstruct or delay activities subject to the rule. Therefore, the final rule is not open to any constitutional objection under the Free Exercise Clause of the First Amendment, even if some of the activities subject to the rule are for a religious purpose.

Requiring a special use authorization for all group uses of National Forest System lands does not substantially burden the free exercise of religion and therefore does not trigger the compelling interest standard under the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2000bb note).

The Supreme Court has held that the nature of the burden is relevant to the standard the government must meet to justify the burden. *Bowen, Secretary of Health and Human Serv.* v. *Roy*, 476 U.S. 693, 707 (1986). In cases in which the Supreme Court has invalidated a governmental action that interfered with an individual's practice of religion, the Court has relied directly or indirectly on the coercive nature of the governmental action or regulation and the imposition of penalties on the free exercise of religion. *See, e.g., Thomas* v. *Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 716–17 (1991) (denial of unemployment benefits to applicant whose religion forbade him to fabricate weapons); *Wisconsin* v. *Yoder*, 406 U.S. 205, 218–19 (1972) (enforcement of compulsory high school attendance law against Amish, in violation of their religion and way of life); *Sherbert* v. *Verner*, 374 U.S. 398, 403–06 (1963) (denial of unemployment compensation benefits to applicant who refused to accept work requiring her to violate the Sabbath). In these cases, the governmental action or legislation criminalized religiously inspired activity or inescapably compelled conduct that some find objectionable for religious reasons.

In contrast, the Supreme Court has upheld governmental action or regulation that indirectly and incidentally imposes a burden on the practice of religious beliefs or calls for a choice between securing a governmental benefit and adherence to religious beliefs. *See, e.g., Roy*, 476 U.S. at 707–08 (federal statute requiring states in administering certain welfare programs to use Social Security numbers, where use of these numbers violated Native American applicants' religious beliefs); *Hamilton* v. *Regents of University of California*, 293 U.S. 245, 262–65 (1934) (curriculum in state university requiring all students to take military courses, where some students sought exclusion from those courses on grounds of their religious beliefs and conscientious objections to war). In these cases, the challenged governmental action interfered significantly with the ability of private persons to pursue spiritual fulfillment according to their own religious beliefs. In none of these cases, however, were the affected individuals coerced by the government's action into violating their religious beliefs, nor did the governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens. *Roy*, 476 U.S. at 703. Under these cases, absent proof of an intent to discriminate against particular religious beliefs or against religion in general, the government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest. *Id.* at 707–08.

Like the governmental action in *Hamilton* and *Roy*, this final rule has no direct or indirect tendency to coerce individuals into acting contrary to their religious beliefs. Nothing in the final rule suggests antagonism by the Department towards religion generally or towards any particular religious beliefs. The special use authorization requirement for group uses is facially neutral and applies to all types of these activities. The Department has made provisions for individual exemption this requirement. Moreover, the requirement is a reasonable means of

promoting the legitimate public interests of resource protection, allocation of space in the face of increasing competition for the use of National Forest System lands, and promotion of public health and safety.

*Comment: Noncommercial Distribution of Printed Material.* Several respondents commented on some issues pertaining to the requirement to obtain a special use authorization for noncommercial distribution of printed material. Approximately 19 respondents stated that the agency's concerns about adverse impacts associated with noncommercial distribution of printed material are hypothetical or inadequate to justify the regulation. One respondent stated that the Bible or other religious tracts could be banned under the proposed rule. Four respondents stated that the special use authorization requirement for noncommercial distribution would allow the agency to censor printed material. Six respondents stated that the proposed rule singles out expressive conduct in regulating noncommercial distribution of printed material. Three respondents stated that the agency can address resource problems associated with noncommercial distribution by establishing a specific and objective policy on posting, fixing, or erecting printed material and on maintaining safe traffic conditions, rather than deciding on a case-by-case basis where and when the activity will be allowed.

One respondent, citing *United States v. Picciotto*, 875 F.2d 345 (D.C. Cir. 1989), argued that resource problems associated with posting, affixing, or erecting printed material cannot be addressed by adding unpublished conditions to special use authorizations, and that any desired restrictions must be published in a rule. Another respondent advised the agency to promulgate regulations making each group responsible for its own discarded printed material. Three respondents commented that regulations already exist for dealing with resource impacts associated with distribution of printed material. Seven respondents questioned where they could distribute noncommercial printed material if they could not do it on public lands. One respondent stated that distribution is defined too broadly in the proposed rule to allow for ample alternative channels of communication. Five respondents stated that the special use authorization requirement for noncommercial distribution of printed material could have the effect of stifling legitimate public protests of Forest Service activities. One respondent commented that a permit for noncommercial distribution of printed material could be **denied for any reason.**

*Response.* The Department has carefully examined the special use authorization requirement for noncommercial distribution of printed material. Based on the comments received on resource impacts and on the Department's review of resource impacts associated with noncommercial distribution of printed material, the Department has determined that these impacts are not significant enough to warrant regulation at this time. Therefore, the Department has removed from the final rule the special use authorization requirement for noncommercial distribution of printed material.

*Comment: Significant Governmental Interests.* **Approximately 75 respondents** commented that the Forest Service had not established a significant interest in **promulgating the rule. Specifically,** these respondents stated that there is no significant governmental interest in protecting the nation's public lands; that the Forest Service's mandate to protect the national forests under 16 U.S.C. 551 is not at issue; that there is no beneficial reason for the regulation; that the proposed rule fails the significant **governmental interest test in** *Clark* v. *CCNV*; that time, place, and manner restrictions are being imposed without an initial finding that they are required; and that restrictions on group uses should exist only when there is a clear environmental reason.

Respondents also stated that the agency's concerns about resource impacts are **hypothetical** or vague and insignificant; that the agency needs proof of resource damage in order to justify the proposed rule; that the agency has not cited evidence that 25 or more people have a greater impact on forest resources and facilities than fewer than 25 people; that 25 or even several hundreds of people gathered for peaceful purposes cannot be a threat to public safety or the environment; that the collective impact on forest resources by a group is equal to or less than the cumulative impact of an identical number of individuals; that it is easier to monitor large group gatherings than small bands of individuals; that individuals in aware groups can monitor each other; that the respondent takes care of the land; that the respondents are not harming the land; that unlike off-road motorcycle races, activities involving the expression of views do not harm forest resources; that group uses cannot cause irreparable damage; that the proposed regulation would take the national forests away from people who gather there at no one else's expense; that large group gatherings do not cost the government a lot of money; and that there have not been any public health problems associated with group uses.

Approximately 30 respondents recognized the Forest Service's significant interest in protection of forest resources. In particular, these respondents stated the following:

—That requiring a special use authorization is appropriate if the size of a group exceeds the capacity of a given area, including campgrounds and parking and staging areas;
—That to protect natural resources, it may be necessary for the Forest Service to regulate activity on **National Forest System lands** through issuance of special use authorizations;
—That to further the public interest, there is sometimes a need for the government to require a special use **authorization for some First** Amendment activities;
—That the concerns associated with large numbers of people gathering on unspoiled land are a challenge and that the people's right to assemble needs to be balanced against the custodial responsibility of the Forest Service;
—**That any** reasonable rules that would protect and preserve the integrity of the National Forest System are appropriate, that the National Forest is an invaluable asset that must be accessible to responsible public use, and that the Forest Service is charged with balancing these concerns;
—That the Forest Service has a mandate to manage National Forest System **lands;**
—That gatherings on public lands should be subject to guidelines established by the Forest Service;
—That some rules and regulations are essential;
—That regulations protecting natural resources are warranted, provided the rules do not infringe upon constitutional rights and provided they target only those who damage natural resources;
—That any rule that helps preserve the national forests is appropriate;
—That restricting access to National Forest System lands is permissible where human impact would harm native wildlife;
—That sanitation and site clean-up are important;
—That the agency's concern for the safety and integrity of the national forests is appropriate;
—That Forest Service employees are to be commended for dedicating their lives to protecting the national forests so that all can enjoy them;

C 0 0 1 4 5

0 0 0 1 4 5

**45262   Federal Register / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Rules and Regulations**

—That the Forest Service gets paid to protect the national forests and the safety of forest visitors;
—That the agency should be concerned about the well-being of the national forests and those who use them;
—That more people have a greater impact on forests;
—That 25 or more people would definitely have a greater impact on resources and facilities than a smaller group of people.

*Response.* As numerous respondents noted, the Forest Service has a mandate to protect the 155 national forests and regulate their occupancy and use for all members of the public (16 U.S.C. 472, 551). Under that mandate, the Department has established three significant interests in promulgating this rule: (1) Protection of forest resources and facilities; (2) promotion of public health and safety; and (3) allocation of space in the face of greater competition for the use of National Forest System lands. While noncommercial group use is an appropriate use of National Forest System lands and exercise of First Amendment rights is extremely important, it is vital to address these significant interests. Numerous respondents have also recognized that these interests are significant. In addition, the Supreme Court has specifically held that protection of public lands for current and future generations is a significant governmental interest. *See Clark* v. *CCNV*, 468 U.S. at 296.

The Forest Service has encountered a variety of problems in connection with noncommercial group use of National Forest System lands. These problems, which are attributable to the size of groups, the concentration of people in a given area, and the physical intensity of the use, have arisen in connection with many different types of noncommercial group uses, both those involving and those not involving the expression of views. These problems have included the spread of disease, pollution from inadequate site clean-up, soil compaction from inadequate site restoration, resource damage in critical salmon habitat, resource damage in riparian zones and meadows, damage to archaeological sites, and traffic congestion.

Although one individual could cause much damage, for example, by setting a forest fire, and a series of individuals could perhaps over time have a significant impact on forest resources, in the Forest Service's experience large groups typically have more impact on a given area than individuals and, with limited exceptions, a special use authorization is not needed for individual uses. Regardless of whether the damage caused by these problems is irreparable, the Department believes that it would further the public interest to control or prevent the damage through a special use authorization system for noncommercial group uses. The authorization system also will allow the Forest Service to allocate space among noncommercial group uses and scheduled and existing uses and activities, including protection of habitat for endangered, threatened, or other plant and animal species.

*Comment.* Adverse Impacts of Group Uses. Approximately 64 respondents argued that other activities, such as off-road motorcycling, clear-cutting, mining, and grazing, have a greater impact on forest resources than noncommercial group uses. Specifically, these respondents stated:
—That the agency's resource impacts rationale seems inadequate, given that the disposal of timber and minerals and the grazing of livestock are exempted from regulation;
—That noncommercial uses and activities are regulated more stringently than other uses that have greater impacts;
—That noncommercial uses and activities should not be included in the same **regulatory framework** as other special uses, such as the **disposal** of timber and **minerals** and the grazing of livestock, that have greater impacts;
—That under the proposed rule, exploitation of the forest for monetary gain **would** take precedence over the right to assemble;
—That the Forest Service has done more damage to public lands than noncommercial group uses;
—That **commercial** uses of the **national** forests should be banned; and
—That clear-cutting authorized by the agency was **responsible** for the listing as an **endangered species of a fresh** water mussel in a creek at the site of the 1993 Alabama Rainbow Family Gathering.

*Response.* The Department disagrees with these comments. The disposal of timber and minerals and the grazing of livestock are not exempted from regulation. As noted in the preamble to the proposed and final rules, the disposal of timber is regulated in 36 CFR part 223; the disposal of minerals is regulated in 36 CFR part 228; and the grazing of livestock is regulated in 36 CFR part 222. The disposal of timber and minerals and the grazing of livestock are thus subject to separate regulations from noncommercial uses and activities. The regulation of timber and mineral disposal and livestock grazing has no bearing on the regulation of noncommercial uses and activities, including activities involving the expression of views. All other commercial uses and activities of National Forest System land require a special use authorization under 36 CFR part 251, subpart B. All commercial uses of National Forest System lands undergo environmental and other reviews prior to approval of any on-the-ground activities.

Commercial use of the National Forest System is appropriate. MUSY authorizes the Forest Service to manage National Forest System lands for both commercial and noncommercial uses (16 U.S.C. 528–531). The agency's regulation of the disposal of timber and minerals and the grazing of livestock is beyond the scope of this rulemaking. **The relative impacts of commercial uses and noncommercial group uses are not relevant to this rulemaking. What is** relevant are the impacts of noncommercial group uses and whether controlling and preventing those impacts warrant regulation of noncommercial group uses. This Department believes that mitigation and prevention of the impacts associated with noncommercial group uses are significant interests that justify the special use authorization requirement.

Noncommercial group uses will not be regulated more stringently under the final rule than other uses and activities that have greater impacts. The final rule restricts the content of an application to information concerning time, place, and manner for noncommercial group uses and establishes very limited circumstances under which an authorized officer can deny or revoke a special use authorization for noncommercial group uses. In contrast, commercial uses and activities subject to 36 CFR parts 222, 223, 228, and 251 are governed by complex regulations that give the authorized officer broad discretion administering the applicable authorization.

*Comment. Significant Governmental Interests With Respect to Rainbow Family Gatherings.* The Rainbow Family of Living Light organizes regular gatherings in the national forests to celebrate life, worship, express ideas and values, and associate with others who share their beliefs. The largest of these meetings is the annual Rainbow Family Gathering. The annual Gathering is held at an undeveloped site in a different national forest each summer and attracts as many as 20,000 people from across the Nation and around the world.

000146

Approximately 130 respondents wrote that the Forest Service has not established a significant interest in requiring a special use authorization for Rainbow Family Gatherings. These respondents stated that concerns associated with Rainbow Family Gatherings have not materialized; that there has been no significant damage in 20 years of Rainbow Family Gatherings; that the Rainbow Family has had gatherings of up to a few thousand people for over a two-week period without major impact to the land or input from the Forest Service; that there is no reason to believe that any similar group would behave differently; and that reports of Rainbow Family Gatherings do not describe any adverse impacts associated with the Gatherings, which have less impact on forest resources than twelve Boy Scouts.

These respondents further stated that there is no hazardous situation, taking of an endangered species, or out of the ordinary resource damage associated with Rainbow Family Gatherings; that the forest is left in better condition after Rainbow Family Gatherings, unlike the way most campers and hunters leave public lands; that at the 1993 Rainbow Family Gathering in Alabama, campsites were carefully planned, garbage was neatly collected and recyclables separated, signs were posted so as to ensure no significant impact on trees, latrines were strategically placed and plainly marked, and an effort was made to notify all Rainbow Family members of the presence of endangered fresh water mussels in a creek at the site; that there has never been a serious illness or public health problem at a Rainbow Family gathering; that Rainbow Family Gatherings usually occur without adverse impact to public health, safety, land, or property; that the Rainbow Family does not need to be regulated by the Forest Service because it has an internal consensus process for regulating itself; that the Rainbow Family takes care of parking; water supply, kitchen hygiene, latrines, and camp safety; that the agency's concern for public health and safety is specious; and that considerations of public health are not related to the purposes of the rule.

Four respondents acknowledged that the annual Rainbow Family Gatherings have a significant impact on the national forests. One respondent stated that camping by any group the size of the annual Rainbow Family Gathering will necessarily have some noticeable impact on the land. Another commented that national forests should be protected and that Rainbow Family Gatherings have a detrimental effect on the plants and animals in the forests. A third acknowledged that Rainbow Family Gatherings take their toll on the ecosystem, and a fourth noted that the annual Rainbow Family Gatherings have a considerable impact on the undeveloped sites chosen for the Gatherings. One respondent noted that many Rainbow Family members required emergency room care during the 1993 Gathering and suggested that the Rainbow Family should arrange for community liaisons prior to the annual Gathering. Two respondents commented that water pollution is evident in the National Forest System: one respondent stated that all water on National Forest System lands should be tested; the other stated that Rainbow Family Gatherings must address the sufficiency of potable drinking water before the Gatherings take place.

*Response.* Forest Service experience is that the Rainbow Family has encouraged gatherers to pick up trash, recycle, compost, protect water sources by not camping or washing near them, naturalize campsites and trails, use latrines, and bury waste. The Rainbow Family also has shown a concern for sanitation at the Gatherings. Nevertheless, the annual Gatherings have a considerable impact on the national forest sites selected by the Rainbow Family and in some instances on public health and safety as well. Controlling or preventing adverse impacts on forest resources and addressing concerns of public health and safety are two purposes of this rule.

Typically, the Rainbow Family chooses an undeveloped site with open fields or meadows. Access to the site is limited. Backcountry eating, sleeping, and cooking facilities are set up for as many as 20,000 people. Parking must be available for their vehicles, which range from cars to double decker buses.

At the 1987 Gathering in North Carolina, for example, impacts included soil compaction and loss of vegetation in the paths to various camps and in the surrounding fields. At the end of the Gathering, there were four acres of fields and about eight miles of paths 12 to 25 feet wide with compacted soil and complete loss of vegetation. Only the latrines near the fields where activities took place were covered; latrines in outlying camps were left open with human waste exposed. The Forest Service had to complete rehabilitation of the site because the Rainbow Family had failed to rehabilitate it adequately. Garbage and trash were not always removed promptly from collection points and piled up. Although the garbage and trash were separated, they were mixed together in receptacles provided by the county. At the end of the Gathering, the Forest Service had to remove a dump truck load and a pickup truck load of garbage that had been left along the sides of the main road through the site.

A serious public health threat arose at the 1987 Gathering. At the site of this Gathering, many Rainbow Family members did not boil water from springs that were high in fecal coliform bacteria. During the week of July 1–4, many people had diarrhea and fever. As people at the Gathering became sick, they used the latrines less and less. Uncovered human wastes were scattered where people traveled and camped. Many people went barefoot and their stepping in uncovered human wastes helped transmit the disease. Hospitals in two states notified the Centers for Disease Control (CDC, now called the Centers for Disease Control and Prevention) in Atlanta that cases of confirmed shigellosis had been detected among people who had attended the Gathering. Shigellosis is a highly contagious form of dysentery, caused by shigellae bacteria. The disease is transmitted by direct or indirect fecal-oral contact from one person to another or by contaminated food or water. Individuals primarily responsible are those who fail to clean adequately their fecally contaminated hands. Transmission by water, milk, or flies may occur as a result of direct fecal contamination. One need ingest only a small number of organisms to contract the disease, and symptoms normally appear within seven days.

Two CDC doctors visited the site of the Gathering the week after July 4 and interviewed a large percentage of the Rainbow Family members remaining at the site. The doctors estimated that 65 percent of those people had shingellosis. At the doctors' suggestion, the Forest Service closed the site to other members of the public from July 15 to 29 for health reasons. By the middle of August, 25 states reported outbreaks of shigellosis traced to people who had attended the Gathering. In early October, cases of the disease were still being reported in 25 states.

Forest Service reports of Rainbow Family Gatherings document adverse impacts associated with the Gatherings. Two of these reports, on the 1991 and 1992 annual Gatherings, were submitted by a respondent along with comments on this rulemaking.

The report on the 1991 Gathering in Vermont documents that site clean-up and rehabilitation were inadequate after the 1990 Gathering in Minnesota. Gatherers left cigarette butts and plastic twist ties on the ground, dumped glass

bottles and metal spoons in compost pits, abandoned a 200-gallon water tank, and left latrines uncovered.

The report on the 1991 Gathering documents that while conducting site clean-up and rehabilitation inspections after the 1991 Gathering, agency officials found a large amount of human waste scattered throughout the woods, even though a sufficient number of well-constructed latrines were distributed throughout the Gathering site.

In addition, the 1991 report notes resource damage that resulted from the impact of large numbers of people using the area. Soil compaction occurred wherever human use was concentrated, that is, at the main meadow, kitchens, camps, and heavily used trails. Vegetation and duff layers in these areas were worn away. New trails made during the Gathering showed varying amounts of erosion. Soil was dug up and sloughed downhill, leaving tree roots exposed. Gatherers made trails down to brooks, often on steep slopes. Eroding soils from these trails threatened the stability and integrity of stream banks and water quality. In several places trails crossed historic rock walls. Heavy pedestrian traffic over the walls caused them to crumble and flatten. An archaeological site located on the trail from the front gate to the main meadow of the Gathering was damaged.

At the 1992 Gathering in Colorado, an insufficient number of latrines were dug at two areas with large concentrations of people (approximately 4200 total). Latrines that were dug at these areas were not placed at flagged locations, and some were too near open water. In general, latrine locations were not adequately marked, particularly at the beginning of the Gathering, which resulted in some surface deposition. Many latrines were not properly covered. No sanitation lime was available until one county health department worker donated 150 pounds to the Rainbow Family.

During the clean-up effort, however, all evidence of surface deposition was removed and all but a few latrines in remote locations were filled in correctly. Clean-up was reasonably orderly, but not timely. While all physical evidence of the Gathering was removed or rearranged to present a natural appearance, the quality of scarification and seeding of exposed soil was variable.

Twenty-seven acres of National Forest System lands in Colorado used for the 1992 Gathering were affected. Soil compaction and loss of vegetation occurred in areas of concentrated use. There were also several traffic and parking problems at the 1992 Gathering. Most of the access routes were steep, winding, single-lane gravel roads. The increased traffic and unfamiliarity of gatherers with these types of road conditions created a safety hazard.

CALM (Center for Alternative Living Medicine) is the group in the Rainbow Family entrusted with the medical care of Family members. At annual Gatherings, CALM sets up health units to treat gatherers' ailments and injuries. CALM represented that they could furnish more than basic first aid at the 1992 Gathering. Visits to CALM units by health department officials and local hospital staff revealed that CALM was equipped to provide only first aid. Many of the bandages at the units were old surplus military issue. Other supplies were limited. No protocol was established to deal with emergency situations. Because CALM was not equipped to deal with emergencies or injuries requiring more than basic first aid, 46 people attending the Gathering had to be treated at a local hospital.

The Department believes that it would be more effective and efficient for the Rainbow Family to address these types of medical and sanitation issues prior to the annual Gathering through the special use authorization process and through enhanced coordination with state and local authorities than on a spontaneous or *post hoc* basis.

*Comment. Need for Law Enforcement at Rainbow Family Gatherings.* Approximately 25 respondents commented that law enforcement at Rainbow Family Gatherings is unnecessary. These respondents stated that there are no threatening incidents at Rainbow Family Gatherings; that Rainbow Family members police themselves; that Rainbow Family members always comply with Forest Service regulations; that all serious problems and violent individuals are brought to the attention of local law enforcement; that Rainbow Family Gatherings have posed fewer security problems than other gatherings of equivalent size; that there are a smaller number of incidents each year; that no drug use was observed at the 1993 Gathering in Alabama; and that unlike uses of public streets or public property in a city, which have impacts on traffic, parking, and neighborhoods and require law enforcement services, group uses of National Forest System lands have no impacts on public facilities and do not require law enforcement services.

In contrast, one respondent acknowledged that Rainbow Family Gatherings attract some people who are not responsible. Several respondents noted that there has been public nudity at the Gatherings. Citing use of marijuana and psychedelics, one respondent noted that the actions of many Rainbow Family members are illegal under present drug laws. Two others noted the use of drugs by some members of the Rainbow Family. One respondent also noted the use of alcohol at Rainbow Family Gatherings.

*Response.* The Department disagrees that law enforcement at Rainbow Family Gatherings is unnecessary. Most Rainbow Family members who gather on national forests are peaceful and law-abiding. As several respondents noted, however, the annual Gatherings attract some who are not.

Consumption of alcoholic beverages is not condoned by the Rainbow Family and is discouraged within the main Gathering. A separate camp, known as "A" Camp, is usually set up along the access route to the main Gathering for those who drink alcoholic beverages. "A" camp has been a problem at several Rainbow Family Gatherings because of its location. "A" Camp gatherers have panhandled, extorted money, and confiscated liquor from people entering the Gathering. Gatherers at "A" Camp also have harassed law enforcement officers and Forest Service personnel.

Forest Service and local law enforcement officers issue a sizeable number of citations for various violations of federal and local law at Rainbow Family Gatherings. For instance, at the 1987 Gathering, there were 311 violations, including citations for driving violations, resource violations, public nudity, impeding traffic, public nuisance, and interfering with an officer. After the Gathering, marijuana plants sprouted where the soil had been dug up by members of the Rainbow Family to plant flowers. Within three weeks after the Gathering, the Forest Service found seventeen marijuana plants approximately one to two feet tall growing from seeds scattered from the handling of marijuana. Possession of marijuana is a violation of federal law, *See* 21 U.S.C. 844.

At the 1991 Gathering, the Forest Service issued 69 notices for ten different violations, including camping in a restricted area, public nudity, parking in violation of instructions, operating a vehicle recklessly, failing to stop for an officer, operating off road carelessly, occupying a day use area, parking in other than designated areas, operating a vehicle off road, and giving false information. Two Rainbow Family members were arrested on drug charge one for possession and the other for sa of LSD.

Federal Register / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Rules and Regulations    45265

The Forest Service's non-environmental concerns were met with resistance at the 1992 Gathering. For example, 20 to 30 Rainbow Family members staged a civil disobedience protest of a Forest Service order closing an area to camping and parking because of safety risks (the area was located on a timber haul route) and commitments made to other users (livestock was scheduled to use the area). Gatherers gradually removed vehicles from the area, but the agency had to tow five from the site.

During the 1992 Gathering, there were 43 arrests of Rainbow Family members on nine different charges, including use of a controlled substance, child abuse, traffic violations, theft, disorderly conduct and harassment, disorderly conduct and possession of a concealed weapon, motor vehicle theft, a wildlife violation, and existence of outstanding warrants.

By comparison, there were 82 arrests of non-Rainbow Family members during the period of the Gathering in the county where the Gathering was held, and 81 during that same period in the previous year. Thus, there was more than a 50 percent increase in the number of arrests in the county during that period, due solely to the presence of the Rainbow Family.

*Comment: Government's Intent With Respect to the Rainbow Family.* Approximately 50 respondents commented that Rainbow Family Gatherings contribute to world peace and love. Many of these respondents asked the agency not to break up the Gatherings.

Seventy-two respondents stated that the proposed rule is a direct attack on the Rainbow Family or is written with the Rainbow Family in mind. Specifically, these respondents believed that the Rainbow Family is the group most affected by the proposed rule; that no other group is mentioned in showing a need for the regulations; that in *United States v. Israel* and *United States v. Rainbow Family*, the agency tried to stop Rainbow Family Gatherings; that the agency imposes less stringent standards for site clean-up on more mainstream groups; that the proposed rule is a vehicle for spying on Rainbow Family members; that Forest Service and state and local law enforcement officers have selectively enforced laws to harass and intimidate people attending Rainbow Family Gatherings; that law enforcement officers have looked for activity that could be construed as illegal; that the Forest Service has been unreasonable and hostile at Rainbow Family Gatherings; that the number of law enforcement officers at Rainbow Family Gatherings is excessive and a waste of money; that law enforcement officers have established checkpoints at the entrance to Rainbow Family Gatherings to search cars and to verify car registration, car insurance, and driver's licenses; that at the 1993 Gathering in Alabama, a few people without car registration or insurance were held in chains and beaten; that state police at the 1993 Gathering conducted regular armed patrols and random searches; and that some Rainbow Family members have been taken into custody and forced to pay a fine for their release.

In contrast, one respondent stated that the proposed rule is clearly aimed at more than just one type of gathering. Another respondent noted that to comply with cases on point, the regulation has been modified to treat all group uses the same, regardless of whether they involve the expression of views. One respondent commented that the Forest Service was hospitable and kept order and did a remarkable job handling the crowd at the 1993 Gathering. Another respondent stated that the Forest Service did an excellent job helping the Rainbow Family have a safe and healthy gathering in 1993 and added that the Forest Service was friendly and helpful.

*Response.* The intent of this rule is not to break up or prohibit any group uses, including Rainbow Family Gatherings. Rather, the intent of this rule is to control or prevent harm to forest resources, address concerns of public health and safety, and allocate space. In *United States v. Israel* and *United States v. Rainbow Family*, the Forest Service was not attempting to prohibit the Rainbow Family Gathering, but rather to enforce existing group use regulations where the Rainbow Family had failed to obtain a special use authorization.

The Forest Service hosts many types of noncommercial group uses on National Forest System lands, such as company picnics, weddings, group hikes and horseback rides, demonstrations, and group gatherings. This final rule does not single out any particular group or type of event. As two respondents noted, this rule applies to all noncommercial group uses, both those involving and those not involving the expression of views. The Department intends to apply this rule consistently and fairly as required by law to all noncommercial group uses.

The Forest Service makes every effort to be friendly and hospitable and to help every group have a safe and healthy visit to the national forests. The agency's law enforcement approach at large group gatherings reinforces this effort. As shown by the reports on the 1991 and 1992 Rainbow Family Gatherings, agency law enforcement officers endeavor to act as good hosts to prevent potential problems; to provide for public safety; to maintain close coordination with other involved agencies, such as the local highway patrol, sheriff's office, and health department; and to ensure in a courteous, professional manner compliance with federal, state, and local law and agency regulations.

To meet these objectives, enhanced law enforcement is needed for group uses. Perimeter patrols by local and federal law enforcement agencies during the 1991 Rainbow Family Gathering, for example, focused on protecting local residents and their property, facilitating traffic flows, maintaining safety on all state and local roads, and responding to visitors' needs or calls for help.

The Forest Service has endeavored to enforce its regulations not only fully but fairly. Some Rainbow Family members who have committed violations at the annual Gatherings have been taken into custody and/or have had to pay a fine. For example, after coordinating with a local United States Magistrate and Assistant United States Attorney, Forest Service law enforcement officers adopted a procedure at the early stages of the 1992 Rainbow Family Gathering to allow prosecution of violators who were temporarily residing in the area. This procedure required violators either to pay a fine upon issuance of a violation notice or to be taken into custody and brought before a magistrate. By paying the fine, the violator did not forego the right to appear in court and contest the violation.

Shortly after receiving complaints about the procedure from Rainbow Family members, the United States Attorney's office recommended that the procedure be altered. The new procedure required that a violation notice for an optional appearance be issued if the violator could present sufficient identification (driver's license, vehicle registration, and proof of insurance in the driver's name). If adequate identification could not be presented, the violator would have to pay the fine upon issuance of the violation notice or be detained. This change in procedure illustrates the agency's effort to balance its law enforcement obligations against its concern for due process.

The Department acknowledges that the level of law enforcement activities may not always have been appropriate for group uses. For example, while it may be appropriate to post Forest

000149

**45266** Federal Register / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Rules and Regulations

Service officials at the entrance to a Rainbow Family Gathering to deter illegal activity and to provide helpful information on the national forests and resource protection, it is not necessary or appropriate to search cars entering the Gathering or to verify the driver's car registration, insurance, and license. This practice was curtailed at a gathering in Mississippi in July 1993 as soon as it came to the attention of responsible Forest Service officials. Promulgation of this rule will help the Department ensure a consistent, nationwide approach to law enforcement for group uses.

*Comment: Government's Intent Generally.* Approximately 40 respondents believed that the intent of the proposed rule is to allow the Forest Service to deny the use of public lands to groups the agency finds undesirable. These respondents stated that the history of the rule shows that the agency's intent is to restrict speech and that by regulating all noncommercial activities under the same standards, the agency is in effect still attempting to restrict First Amendment rights. These respondents felt that if the agency really supported the rights of free speech and assembly, it would be apparent from the proposed rule and there would be no need to state it in the preamble.

Other respondents stated that the proposed rule masks an agenda that has nothing to do with protecting resources and addressing public health and safety; that the Forest Service has invoked public health concerns rigidly and arbitrarily to discourage gatherings and has used these concerns as a pretext for taking other enforcement action, such as dealing with the use of illegal drugs; and that given the proposed rule is written like a legal brief, with a provision for immediate judicial review, and the agency's past attempts to regulate noncommercial group use, it is reasonable to view this regulation as an attempt to restrict assemblies via court order.

Other respondents stated that the agency should specify what will be done to ensure that enforcement of the rule will not result in acts of terrorism against those who like to gather in the national forests; that the proposed rule targets those who go to the forests to worship; that the proposed rule is a direct attack on naturists; that the agency doesn't need a regulation to ensure equal treatment for all groups because equal treatment is already guaranteed by the Constitution; that the proposed rule can be selectively enforced and is therefore discriminatory in nature; that the proposed rule is discriminatory in nature, particularly in view of the severe restrictions on Native Americans' access to tribal lands and the intimidation of Native Americans by law enforcement; and that those responsible for the inception and formulation of the proposed rule are enemies of the people of this country.

*Response.* The intent of this rule is not to deny the use of National Forest System lands to any group, nor is the intent of this rule to restrict speech. Rather, the intent of this rule is to implement reasonable time, place, and manner restrictions on group uses of National Forest System lands.

In addition to the need to mitigate adverse impacts on forest resources and to address concerns of public health and safety, there is a need to allocate space in the face of increasing legal constraints on the use of National Forest System lands, including the need to protect endangered, threatened, or other plant and animal species. The competition for available sites in the national forests among animals, plants, and humans has increased as more demands and restrictions have been placed on use of the national forests. Requiring a special use authorization allows the agency to act as a kind of "reservation desk" for proposed uses and activities, including noncommercial group uses.

The Department believes that its support for the rights of free speech and assembly is not only stated in the preamble, but is apparent from the language and structure of the rule. The rule does not single out any group. On the contrary, the final rule establishes one category called "noncommercial group uses"; restricts the content of an application for noncommercial group uses to information concerning time, place, and manner; applies the same evaluation criteria to all applications for noncommercial group uses regardless of whether they involve the expression of views; establishes specific, content-neutral evaluation criteria for noncommercial group uses; provides that applications for noncommercial group uses will be granted or denied within a short, specific timeframe; provides that if an application is denied and an alternative time, place, or manner will allow the applicant to meet all the evaluation criteria, the authorized officer will offer that alternative; provides that the authorized officer will explain in writing the reason for denial of applications for noncommercial group uses; and provides that such a denial is immediately subject to judicial review. These provisions have been included to meet the constitutional requirements of a valid time, place, and manner restriction identified in case law, including *United States* v. *Israel* and *United States* v. *Rainbow Family.*

This rule is needed to ensure equal treatment for all groups. Various members of the public and state and local governments have criticized the Forest Service for applying a double standard in not requiring all large groups to obtain a special use authorization. This rule ensures that all noncommercial groups are treated equally under the law.

It is the Department's intent that this rule will be applied consistently to all noncommercial groups as required by law. Moreover, it is essential, both as a matter of fairness and as a matter of constitutional law, that this rule be applied uniformly. The Forest Service intends to provide training to its personnel to ensure that the rule is implemented consistently.

*Comment: Least Restrictive Means To Further the Government's Interests.* Approximately 95 respondents indicated that the Forest Service has not employed the least restrictive means to achieve its interests. These respondents stated that the proposed rule is unnecessary because, as the court in the *Rainbow Family* case held, there are other laws and regulations that address the agency's interests in promulgating the proposed rule; that the agency should deal with violations of other regulations as they occur; that there is no need for a permit requirement because encouraging groups to contact the agency prior to their proposed activities is sufficient to address the agency's concerns; that the agency does not need to require a permit because requiring notice of a proposed activity is sufficient; that mid-sized groups of 50 to 100 people should only have to notify the Forest Service of their activity, rather than obtain a permit; that there is no need for an application and permitting system and that the agency should allow a group to gather if they meet all other parts of the proposed rule; and that the proposed rule should not apply at developed campgrounds or areas set aside for group uses.

Additionally, these respondents stated that given that impacts vary depending upon the type of activity, the Forest Service should issue specific and objective standards for those activities that are problematic, and that the agency could also intensify education programs for specific groups that cause problems; that a special use authorization should not be required for church, club, or family gatherings; that a simple assessment, roping off of high risk areas, and site-specific camping requirements have sufficed for

000150

Federal Register / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Rules and Regulations    45267

gatherings of over 20,000; and that with respect to the Rainbow Family, the Forest Service has been able through informal cooperation to achieve its objectives concerning resource protection, promotion of public health and safety, and space allocation.

*Response.* Less restrictive alternatives are not part of the test for the validity of a time, place, and manner regulation like this final rule. Rather, the test is limited to whether the regulation is content-neutral, whether it is narrowly tailored to further a significant governmental interest, and whether it leaves open ample alternative channels for communication. *Clark* v. *CCNV,* 468 U.S. at 293.

In *Clark* v. *CCNV,* where the Court upheld a National Park Service regulation that prohibited camping in certain parks in Washington, D.C., the Supreme Court rejected the Court of Appeals' view that the challenged regulation was unnecessary, and hence invalid, because there were less speech-restrictive alternatives that could have satisfied the governmental interest in preserving national park lands. The Supreme Court held that the less-restrictive alternatives proposed by the Court of Appeals represented no more than a disagreement with the National Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. 468 U.S. at 299.

Thus, it is immaterial if there are less restrictive alternatives to the special use authorization requirement for noncommercial group uses, as long as the final rule meets the test for constitutionality enunciated in *Clark* v. *CCNV.* Under *Clark* v. *CCNV,* the federal land management agencies, rather than the courts, have the authority to manage federal lands and the competence to judge how much protection of those lands is wise and how that level of conservation is to be attained. 468 U.S. at 299.

Even though less restrictive alternatives are not part of the test for constitutionality for time, place, and manner regulations, the Department believes that the special use authorization requirement is the least restrictive means to accomplish the government's interests. Other laws and regulations, such as the Endangered Species Act and rules providing for the issuance of closure orders, address resource protection and public health and safety in general. Other laws and regulations do not, however, provide the framework necessary for applying those standards for resource protection and public health and safety to noncommercial group uses. Other laws and regulations do not allow the Forest Service to control or prevent adverse impacts on forest resources from noncommercial group uses, to address concerns of public health and safety associated with noncommercial group uses, or to allocate space for noncommercial group uses and other uses and activities.

In *United States* v. *Rainbow Family,* the court denied the government's motion for a preliminary injunction to enforce the group use regulation on the grounds that the regulation was unconstitutional and not validly implemented. The court stated in dicta that the government had an adequate remedy at law which would also preclude granting the motion, in that there were other laws and regulations to address the government's concerns in seeking the injunction. 695 F. Supp. at 314. The court never ruled on the existence of an adequate remedy at law for purposes of obtaining a preliminary injunction. Even if the court had ruled on this issue, it would have been immaterial to the assessment of the constitutional validity of this final rule.

Requiring notice of a proposed activity is also insufficient to address the concerns underlying the final rule because the agency still lacks the ability to regulate the activity. Without the application and permitting system, the authorized officer cannot determine whether the evaluation criteria in the final rule are satisfied. This final rule will not apply at developed recreation sites where use is allocated under a formal reservation system and where the agency has the authority to manage and to charge a user fee to the public under the Land and Water Conservation Fund Act (16 U.S.C. 4601-6a).

The Department has determined that it has sufficient interests in regulating noncommercial group uses. Regulating only those activities or groups that have caused problems in the past would be difficult to defend. The courts in *United States* v. *Israel* and *United States* v. *Rainbow Family* held that in regulating noncommercial group uses the agency cannot single out expressive conduct and treat it differently from other activities, and that the regulation must have clear and objective standards. Regulating only certain groups or activities based on a judgment of which ones have caused problems sufficient to warrant regulation could be viewed as singling out expressive conduct on the basis of a subjective standard. The same concern would apply if the Department exempted certain types of noncommercial group uses, like church, club, or family gatherings, from the special use authorization requirement.

Finally, as shown by the reports on the 1991 and 1992 Rainbow Family Gatherings, the Forest Service has not always been able to achieve its objectives concerning resource protection and space allocation through informal cooperation with the Rainbow Family. In particular, agency personnel have been frustrated in dealings with Rainbow Family members because informal agreements made with one individual or subgroup have not been respected by other group members. It has thus been difficult for the agency to obtain commitments from the Rainbow Family on issues pertaining to the Gatherings. On a number of issues, the agency has had to recommence discussions at each encounter with Rainbow Family members. The special use authorization process will enhance the agency's ability to achieve its objectives by allowing the agency to obtain commitments from the Rainbow Family that apply to the group as a whole.

*Comment: Ample Alternative Channels for Communication.* Approximately 27 respondents felt that the proposed regulation does not leave open ample alternative channels of communication. These respondents stated that there is no adequate substitute for peaceable assembly as a form of communication; without a permit, a proposed activity could not occur on National Forest System lands; and that the Rainbow Family is not an organized group and has no other place to go.

*Response.* The Department disagrees with these comments. The final rule leaves open ample alternative channels of communication. The final rule does not restrict, and is not intended to restrict, freedom of thought or expression. Nor does the final rule prohibit any expressive activities. Rather, the final rule requires a special use authorization for noncommercial group uses on the national forests. Moreover, § 251.54(h)(2) of the final rule provides that if an application is denied and an alternative time, place, or manner will allow the applicant to meet all the evaluation criteria, the authorized officer shall offer that alternative.

*Comment: Enforceability.* Approximately 28 respondents commented on the enforceability of the proposed rule. Specifically, six respondents stated that enforcement of the rule would be provocative and confrontational because the rule would be ignored and the agency would have to make mass arrests, disperse large crowds, or obtain a restraining order to enforce it. Thirty respondents stated

000151

Forest System lands may be impacted by a proposed activity.

Requiring religious groups to provide a description of the National Forest System lands and facilities they would like to use does not impose an undue burden on free exercise of religion. Religious groups have applied for and have obtained permits to hold services at specific sites on public lands. See, e.g., O'Hair v. Andrus, 613 F.2d 931 (D.C. Cir. 1979) (National Park Service permit authorizing outdoor Catholic Mass on National Mall).

Authorization of noncommercial group uses will not be less likely than authorization of other uses. On the contrary, the Department intends to authorize noncommercial group uses to the full extent allowed under this rule. The Department also intends to apply this rule consistently and fairly as required by law to all noncommercial group uses. While the agency retains the discretion to determine the size of an area needed to support an activity, drawing an authorization boundary smaller than required would not be environmentally defensible as that approach would increase rather than reduce risks to forest resources.

The amount of time needed to process an application will not require a group to commit to a site early. Under § 251.54(f)(5) of the final rule, applications will be granted or denied within 48 hours of receipt. However, a group may still find it necessary to commit to a site early due to factors that are beyond the control of the Forest Service, such as the popularity of the site.

Comment. Section 251.54(e)(2)(i)(C) of the proposed rule required the applicant to provide the estimated number of participants and spectators.

Three respondents commented on this provision. One respondent commented that it is reasonable for the Forest Service to request an estimate of the number of participants and spectators, but that requiring that estimate prior to an activity places an undue burden on the public. Another respondent stated that this provision could be used to limit attendance at an activity on the pretext of mitigating environmental impact. One respondent commented that regulating the number of participants and spectators is not a valid time, place, and manner restriction.

Response. The Department believes that it is both reasonable and necessary to require proponents to provide in advance an estimate of the number of participants and spectators. Failure to require prior notice of the anticipated attendance would defeat the Department's purposes of resource protection, promotion of public health and safety, and allocation of space within the national Forest System. Without this information, for example, the Forest Service would not know the kinds of mitigative and preventive measures to take in authorizing noncommercial group uses. As a result, these uses could pose a substantial risk of damage to National Forest System lands and resources.

This provision is a necessary component of a valid time, place, and manner restriction. For example, the applicable forest plan might limit the number of people that can be accommodated at a proposed site. The Forest Service would need an estimate of the number of participants and spectators to determine whether that number fell within the limit established by the forest plan. In addition, the agency would need to know the anticipated attendance in order to determine the number of toilets or latrines needed or the sufficiency of potable drinking water at the proposed site. Finally, while numbers of people can have varying degrees of environmental impact on a site, the agency cannot under this rule limit the number of people attending an activity. The agency can only accommodate that number.

Having considered the comments received, the Department has retained without change § 251.54(e)(2)(i)(C) in the final rule.

Comment. Section 251.54(e)(2)(i)(D) of the proposed rule required applicants to provide the date and time of the proposed activity.

Two respondents commented on this provision. One respondent stated that it is reasonable for the Forest Service to request the date and time of a proposed activity, but that requiring that information before an activity places an undue burden on the public. Another respondent commented that the agency could authorize a shorter time than requested, so that anyone at the site before or after that time would be in violation of the permit.

Response. The proposed rule merely required the date and time of the proposed activity. Thus, the proposed rule required applicants to specify when but not how long a proposed activity would occur. Accordingly, the Department has amended § 251.54(e)(2)(i)(D) in the final rule to require applicants to provide the starting and ending date and time of a proposed activity.

The Department believes that it is both reasonable and necessary to require applicants to indicate in advance both when and how long a proposed activity will occur. Failure to require prior notice of this information would defeat the Department's purposes of resource protection, promotion of public health and safety, and allocation of space within the National Forest System. Without this information, for example, the Forest Service would not know the kinds of mitigative and preventive measures to take in authorizing noncommercial group uses. As a result, these uses could pose a substantial risk of danger to National Forest System lands and resources.

Authorization of noncommercial group uses will not be less likely than authorization of other uses. On the contrary, the Department intends to authorize noncommercial group uses to the full extent allowed under this rule. The Department also intends to apply this rule consistently and fairly as required by law to all noncommercial group uses.

It would be inconsistent with this intent to authorize a shorter time than requested for the purpose of finding anyone at the site before or after that time in violation of the authorization. However, there could be a compelling need to adjust the requested time period. For example, the agency might suggest an alternate date or site for a school-sponsored camping event if the requested date and site would place students in jeopardy on the opening day of deer hunting season.

Comment. Section 251.54(e)(2)(i)(E) of the proposed rule required applicants to provide the name of the person or persons 21 years of age or older who will sign a special use authorization on behalf of the applicant.

Four respondents recommended dropping the age limitation in this provision. These respondents believed that the age limitation prevents persons under the age of 21 from exercising their First Amendment rights, and that the agency should lower the age limit to 18 or drop it altogether; that those under the age of 21 would not be able to gather unless the ideas they espouse have been adopted by someone 21 years of age or older; that the provision discriminates against citizens under the age of 21, who will not be able to gather in groups of 25 or more; that this provision establishes a restriction on First Amendment activity that does not apply to other activities, since younger people can still go camping in small groups without a permit, which could present equal or greater risks to the resource; and that although each Rainbow Family member could get his or her own permit, then no one under the age of 21 could attend the Gathering.

**45274** Federal Register / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Rules and Regulations

Approximately 19 respondents indicated that it is not appropriate to make one individual responsible for an entire group. Specifically, these respondents stated that individual group members will no longer be responsible for themselves; that individuals should accept responsibility only for themselves; that it is reasonable for a group to give a person's name in the spirit of cooperation, but that it is not reasonable to require one person to assume responsibility for others; that a group should take responsibility for itself, and that if one person signs a permit, the group's solidarity will be broken; that this requirement is unreasonable if a group is not a legal entity and acts by consensus rather than by hierarchy; that if no representative from the group will sign because the group has no leader and because decisions are made by consensus, the Forest Service could find anyone 21 years of age or older or a representative from a different group to sign the permit, thus circumventing the process of decisionmaking by consensus; that individuals in the group will lose their autonomy; that those individuals who are responsible for any damage could make restitution with the aid of the whole group; that this requirement is particularly inappropriate where a group hesitates on philosophical grounds to appoint agents or representatives to speak on its behalf, and that the agency has said that it is unreasonable and impracticable to deal separately with each member of a large group, but that there is no reason for such a group to alter its philosophical grounds unless the agency shows that it has had to deal separately with each group member; that certain religious practices do not recognize a leader who takes responsibility for the group; that making one individual responsible for a permit makes the activity seem like a commercial venture.

Two respondents commented that this provision is unenforceable against the Rainbow Family because they have no leader. One of these respondents stated that no member of the Rainbow Family can speak for, sign for, or be held responsible for another.

*Response.* The Department believes that the age limitation in § 251.54(e)(2)(i)(E) of the final rule is a reasonable time, place, and manner restriction. The restriction is necessary to ensure that those who are designated to sign and who do sign a special use authorization on behalf of a group are of the age of legal majority. The signature gives the authorization legal effect. If the person or persons who sign the authorization are not of the age of legal majority, the authorization is not legally enforceable. Since the age of legal majority is not the same in every state but in no state exceeds the age of 21, the final rule requires that the person or persons who are designated to sign and who do sign a special use authorization be at least 21 years of age.

The Department does not believe that this age limitation imposes an undue burden on the exercise of First Amendment rights by those under the age of 21. The final rule does not prohibit groups of 75 or more people under the age of 21 from gathering in the national forests, nor does the final rule require that these groups include a person 21 years of age or older. Rather, the final rule requires that a person or persons 21 years of age or older be designated to sign a special use authorization and that that designated person sign an authorization on behalf of the group.

It is not appropriate or necessary for each member of a group to sign a special use authorization. It is also not appropriate or necessary for one member or a few members of a group to assume personal responsibility for the actions of other group members. Individual group members are personally responsible for their own actions. A person who signs a special use authorization for a noncommercial group use acts as an agent for the group, but does not assume personal responsibility for the group's actions.

However, it is appropriate and necessary to ensure that a group will be responsible for the actions of its members as a whole that relate to the use and occupancy of National Forest System lands by requiring a person or persons to sign a special use authorization as an agent or representative of the group. Requiring that a person or persons sign the special use authorization on behalf of the group will not weaken the group's solidarity; on the contrary, this requirement can serve to enhance the group's solidarity by ensuring that the group will take responsibility for its actions. By signing a special use authorization on behalf of the group, the agent or representative gives the authorization legal effect and subjects the group to the authorization's terms and conditions.

In addition, the Forest Service needs to have someone to contact for purposes of special use administration. The authorized officer may have questions about the application or may need to notify the applicant in the event of an emergency. If the application does not identify a contact person, the Forest Service cannot make the appropriate notifications.

As shown by the reports on the 1991 and 1992 Rainbow Family Gatherings, a group does not designate a representative or representatives, the Forest Service has to deal separately with various individual members and subgroups. Informal agreements made with one individual member or sub-group are not always respected by other group members, which makes it difficult for the agency to obtain commitments from the group as a whole. The special use authorization process will allow the agency to obtain commitments from the Rainbow Family that apply to the group as a whole.

Non-members of a group cannot sign a special use authorization on behalf of a group unless they are designated by the group to act as its agents or representatives and are authorized to make the group responsible for the actions of its members as a whole. Requiring a group to designate a person or persons who will sign a special use authorization on behalf of the group does not make a group use a commercial venture under this rule. Under the final rule, a group use is a commercial use or activity if an entry or participation fee is charged or if the primary purpose of the activity is the sale of a good or service, and in either case, regardless of whether the use or activity is intended to produce a profit. All groups, both commercial and noncommercial, should be responsible for the actions of their members as a whole that relate to the use and occupancy of National Forest System lands.

The Department believes that it is both fair and appropriate to apply this provision to all applicants, including groups like the Rainbow Family that make decisions by consensus. The group can, for example, designate a representative or representatives who can sign a special use authorization on behalf of the group. Groups that make decisions by consensus could select a representative through that decisionmaking process.

As one respondent noted, the court in *United States v. Rainbow Family* held that the Rainbow Family is an unincorporated association that can sue and be sued. 695 F. Supp. at 298. The court also held that service upon the Rainbow Family was properly effected in that case by service upon several individuals who acted as agents or representatives of the Rainbow Family. *Id.* Moreover, in 1987, representatives of the Rainbow Family signed a consent judgment in a suit brought by the Health Director of the State of North Carolina against the Rainbow Family for failure to obtain a permit under the State's mass gathering statute. It is therefore

000153

Federal Register / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Rules and Regulations    45275

reasonable to believe that the Rainbow Family could designate a person or persons to sign a special use authorization on behalf of the group as provided in § 251.54(e)(2)(i)(E).

Having considered the comments received, the Department has retained without change § 251.54(e)(2)(i)(E) in the final rule.

*Comment.* Section 251.54(e)(2)(ii)(D) of the existing rule enumerates certain information that might have to be provided by a private corporation applying for a special use authorization. The proposed rule redesignated this provision but did not offer any substantive change.

One respondent commented that the minimum amount of information required from a private corporation applying for a special use authorization is much greater than what is required from any other category of applicant and that the only information needed from private corporations is evidence of incorporation and good standing.

*Response.* This provision was not subject to substantive amendment under the proposed rule, is not being amended by the final rule, and has no bearing on the subject matter of this rule. Therefore, this provision is beyond the scope of this rulemaking. However, the Department believes that it may be appropriate to require private corporations applying for a special use authorization to provide more than evidence of incorporation and good standing.

*Comment.* A provision in § 251.54(e)(1) of the existing rule requiring the Forest Service to give due deference to the findings of another agency, such as a public utility commission, the Federal Energy Regulatory Commission, or the Interstate Commerce Commission, in lieu of another detailed finding, was proposed to be moved to a new § 251.54(f)(4) of the proposed rule, since this provision relates to the processing of applications rather than to their content. This was a technical rather than a substantive amendment.

Two respondents commented on this provision. One respondent stated that if the Forest Service defers to the findings of another agency, an application for a special use authorization could be subjected to the agenda of any part of government. The other respondent commented that this provision applies a large body of administrative law to the review of applications for a special use authorization, subject to the discretion of the authorized officer, and places the burden of documenting the findings of other agencies on the applicant.

*Response.* This provision was not subject to substantive amendment under the proposed rule, is not being amended by the final rule, and has no bearing on the subject matter of this rule. Therefore, this provision is beyond the scope of this rulemaking. Nevertheless, the Department believes that this provision makes the application process more efficient by allowing the Forest Service to defer to relevant findings of other agencies, rather than making another detailed finding, in evaluating applications for commercial special use authorizations.

*Comment.* Section 251.54(f)(5) of the proposed rule provided that the agency would grant or deny an application for noncommercial group uses without unreasonable delay. On the one hand, First Amendment due process considerations require a specific timeframe for granting or denying an application for noncommercial group uses. On the other hand, a decision to issue a special use authorization triggers extensive statutory and regulatory requirements such as those imposed by the ESA and NEPA. Section 251.54(f)(5) of the proposed rule reflected the agency's effort to balance the competing concerns of complying with these First Amendment due process considerations and the statutory and regulatory requirements triggered by a decision to issue a special use authorization.

Approximately 65 respondents commented that this proposed provision is too vague and would allow for too much discretion because it fails to provide a definite timeframe for granting or denying an application. Four respondents cited *United States* v. *Rainbow Family* in support of their position. One respondent cited footnote 5 in *United States* v.*Abney*, 534 F.2d 984 (D.C. Cir. 1976), for the proposition that applications for First Amendment activities must be handled on an expedited basis to avoid de facto censorship of certain points of view.

Several respondents recommended an expeditious procedure for reviewing applications. Four respondents stated that the National Park Service has a specific timeframe for evaluating permit applications for First Amendment activities. One respondent cited 36 CFR 7.96(g)(3), which provides that National Park Service permit applications for demonstrations in the National Capital Region are deemed granted if not acted upon within 24 hours of receipt.

Two respondents commented that the need to comply with statutory and regulatory requirements could not justify the agency's position and that the Forest Service should set a short timeframe and deny an application within that timeframe if the agency needed more time to complete an environmental impact statement.

One respondent suggested that permits should be issued immediately where the forest plan identifies the proposed activity as appropriate for the requested area and where the proposed activity meets applicable standards and guidelines. Another respondent commented that if the group threshold remains at 25, the decision should be made almost immediately where the requested stay is three days and two nights or less, where the activity is to be held in an area designed for a large group, such as a developed campground, and where the forest plan recognizes the activity as appropriate for the desired area. The same respondent added that if the group threshold was raised to 50, the decision should be made within 15 days.

One respondent suggested that the agency grant or deny applications within three working days. Another respondent recommended a timeframe of six weeks for evaluating applications. One respondent suggested that an application should be granted or denied 30 to 60 days after completion of the necessary NEPA analysis, which could range from categorically excluding the proposed activity from documentation in an environmental impact statement or an environmental assessment to preparation of an environmental impact statement, depending on the intensity, scope, duration, and location of the activity.

Others stated that the agency could take as long as it liked to review applications, which could wreck a group's plan; that because the agency could take a long time to evaluate applications, proponents would have to apply far in advance; that this provision could allow denial by slow response; that applicants would have to go to court to expedite the process; that the lack of a specific timeframe undercuts the due process protection of immediate judicial review since access to the courts would be denied until a decision was made; that it is unclear why it is infeasible to specify a timeframe; that there is no evidence that NEPA, the ESA, and the NHPA apply to applications for noncommercial group uses or noncommercial distribution of printed material and that even if these statutes did apply, the Forest Service could survey the land and as part of the planning process either identify sensitive areas that need protective or designate areas suited for the activities in question; that the proposed rule does not define "unreasonable"; that this provision injects too much uncertainty