**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

SCOTT SOWKA

Defendant, Appellant.

Appeal No. 06-cr-282-WDM

On Appeal from Judgment of the US Magistrate: Criminal Case No: F4067046

---

# Appellant's Reply Brief

---

## Table of Contents

1. Introduction ..... 1
2. Sincerity of Appellant's Religious Beliefs ..... 2
3. Burdens Placed on the Appellant's Religious Beliefs ..... 2
4. Appellant's Failure to Apply for a Permit ..... 4
5. The Government's Contextual Determination ..... 5
6. Alleged Harms of Granting a Religious Use Exception ..... 9
7. The Existence of Less Restrictive, Alternative means ..... 10
8. Summation and Conclusions ..... 14

### 1. Introduction

This reply brief revisits Appellant's position as regards the sincerity of his religious beliefs and the burdens placed on those beliefs by government actions, and refutes several arguments made by the Appellee.

Appellant agrees with the government's identification of the legal criteria by which to judge his RFRA defense pursuant to *Meyers* and *Hardman* as a *de novo* review of whether the challenged regulations and government actions substantially burden exercise

of Appellant's religion and whether the regulation is the least restrictive means available to satisfy governmental interests shown to be compelling (Answer Br. 12).

### 2. Sincerity of Appellant's Religious Beliefs

At trial and on appeal, Appellant presented a large body of testimony and evidence in support of the existence and sincerity of his religious beliefs. On appeal, the government does not challenge Appellant's demonstration of sincere religious beliefs (Answer Br. 16), nor did they contest such at trial. Therefore, the only contested issues in the RFRA defense analysis are whether the regulation substantially burdens exercise of Appellant's beliefs and whether any less restrictive means are available for the USFS to satisfy government interests shown to be compelling.

### 3. Burdens Placed on the Appellant's Religious Beliefs

At trial and on appeal, Appellant presented a large body of testimony and evidence demonstrating that multiple burdens had been placed on the practice of his religion by government actions. Among these were the permit application timeliness and signature requirements that forced Appellant to choose between violating his religious beliefs or being denied a government benefit (legal access to public land), the attempt by the USFS to prevent Defendant and his family from physically entering the Gathering site, the unreasonable court appearance requirements of violation notices that required Defendant and his family to forego religious practices for a number of days, and the fine levied against Defendant for engaging in practice of his religious beliefs, among others.

At trial, the USFS Incident Command Team (ICT) commander testified that it was his professional intention to prevent the Gathering, a practice key to Defendant's religious beliefs, from occurring (Transcript 35, 9-22). He also admitted that the only way for the defendant to avoid prosecution was to refrain from practicing his religion (Transcript 34,

4-9). At trial, the government challenged none of these assertions. At no point does the Appellee address these burdens, other than those imposed by timeliness and signature requirements of the permit application, which constitute a minority of the burdens imposed.

On appeal, the government differs to the Magistrate's ruling that no burden exists, the validity of which has been previously put to question by the Appellant. This is a peculiar statement considering the Appellee's request for *de novo* review. The Appellee otherwise introduces no factual evidence refuting substantial burden.

Appellant agrees that "forcing a decision between forfeiture of benefits and abandoning religious tenets is analogous to imposing a fine against [a defendant because of his/her religious practices]" (Answer Br. 17). In this case, the defendant was forced to make the aforementioned choice *and* a fine was imposed for his refusal to abandon his religious practices.

On appeal, the government examines *Navajo Nation* as corollary to this case, pointing out that no burden was shown to exist in that case, "especially given that the Forest Service guaranteed continued access to the areas in question" (Answer Br. 17). However, it has been shown that the USFS, in the case before the court, went to great lengths to deny religious users access to the area in question.

Without any evidentiary support, the government argues "the signature and timeliness requirements do not coerce Defendant into violating his religious tenets", and yet acknowledges, "…Defendant's religion may prohibit him from signing anything on behalf of the Rainbow Family" (Answer Br. 18).

Finally, the government attempts to justify obvious burdens placed on Defendant's free exercise of religion by pointing out that he did "not show that gatherings must be held on National Forest land as opposed to any other public place," (Answer Br. 18), erroneously suggesting that it is Appellant's burden to show evidence of the negative existence of an alternative place. The government does not show that an alternative place exists. Moreover, the government went to great lengths to demonstrate that the annual Gathering of the RFLL, in 2006, occurred in a specific area of the Routt National Forest and not at some other alternative site (Transcript 15, 10 through 16, 7; 18, 20 through 19, 5; Exhibit 1, 1 & 5; Exhibit 3; etc.) and it is this Gathering that the defendant is mandated to visit as a part of his religious practices.

### 4. Appellant's Failure to Apply for a Permit

It is suggested by the government that "a failure to apply for a permit (where such an attempt would not have been futile) precludes a challenge that the permitting process violated constitutional rights," (Answer Br. 5). In this case, such an attempt would have been futile.

Though an initial application was allegedly filed and denied, the government does not show that the Defendant was involved in this communication loop prior to his arrival at the Gathering. Nor could the ICT commander name the individual who supposedly filed an application (Transcript 31, 22-23). By the time Defendant arrived and became aware of the situation, applications attempting to permit the 2006 annual gathering at it's current site were not even being accepted, let alone considered or made subject to judicial review (Transcript 31, 24 through 32, 6). Defendant may have applied for a separate group-use permit for a different location, refused to sign, and moved to judicial review, but such attempt would have been futile in context because the annual gathering of the RFLL,

which Defendant's religion specifically requires him to attend, was already in progress at the original, un-permitted site. A second, permitted event would not have been the annual Gathering.

Had Defendant, at any time, claimed to be a representative or contact person for the RFLL, he would have been guilty of fraud because he was never designated as such by the group. Defendant was therefore incapable of entering any application on behalf of the group.

It should be noted that Defendant was not charged with failure to apply for a permit, but with simple occupancy. Arguments opposing signature and timeliness requirements were introduced by Appellant to demonstrate how the permit process itself and the resulting illegality of the Gathering violate RFRA, but the burdens shown by Appellant are not limited to those imposed by the permit process.

### 5. The Government's Contextual Determination

Appellant agrees that a case by case, contextual determination is required to prove that a compelling interest is at risk in any given application of the RFRA defense, however, the determination offered by the Appellee in this case is insufficient.

All of pages 25 through 27 of Appellee's Answer Brief should be disregarded because the government's rationale to justify the Forest Service's refusal to offer an alternative to the signature requirement on account of a history of threats to the environment and public health is wholly devoid of support in any record of evidence before the trial court. The government raises this issue for the first time in its Answer Brief. Though Appellant stipulated into evidence certain pages of the Federal Register from which these allegations are drawn, the allegations appear on pages not stipulated (Transcript 23, 15-20; Exhibit A). If the government had sought to present evidence to

support these allegations, Appellant would have been able to object to relevancy, cross examine the authors of the report, and offer contradicting evidence. Appellant had no opportunity to challenge the allegations. Consideration of these allegations by this court would deprive Appellant of his Due Process rights.

Even if these allegations are considered by the court, they do not properly serve as a case by case, contextual determination that religious exception to the occupancy laws, granted to Defendant, would endanger compelling government interests. Primarily, all of the abuses introduced by the government (Answer Br. 25-27) were alleged to occur prior to the year 2000, which was the first year that Defendant was associated with the RFLL (Transcript 68, 3-4). The government thereby suggests that an individual can be held vicariously liable for actions taken at events which he did not attend, and for actions undertaken by groups with which he did not associate.

The majority of allegations raised by the government accuse the RFLL of resource damage stemming from improper trail removal and waste management, and public safety endangerment stemming from improper waste management and water treatment (Answer Br. 26), none of which were at issue during the 2006 gathering. These allegations amount to the undesired outcomes of risks which may be attributed to any large group of people living under primitive conditions and, in fact, there is no comparative evidence to show whether the RFLL Gatherings present risks equal to or greater than those that would be presented by another group under the same circumstances. However, at trial, both the prosecution and defense introduced a bulk of evidence and testimony of RFLL practices and traditions meant to lessen these risks. It may be therefore assumed that the RFLL is less likely than another group to cause the undesired outcomes mentioned.

Furthermore, there is no evidence to demonstrate a definitive casual relationship between RFLL Gatherings and the alleged damages. The earliest allegation was said to have occurred in 1987 (Answer Br. 26), three years after the USFS adopted its first regulations to criminalize the annual Gathering (Transcript 69, 4-5) thereby adopting a law enforcement rather than resource management strategy. It is therefore equally reasonable to assert that the law enforcement tactics of the USFS (targeting infrastructure, arresting the clean-up crew, etc.) were the actual cause of these damages. It is certainly curious that no resource or public safety damages occurred during the first fifteen of thirty-four annual gatherings, twelve of which were managed by the USFS using a resource strategy exclusively.

Nor do any of the alleged damages stem from gatherings more current than 2000. It might be asserted that the RFLL has already addressed problems likely to lead to such unfavorable outcomes. For example, one allegation claims that a lack of organized medical personnel caused increased public health dangers at the 1992 Gathering (Answer Br. 27), but this year, ICT Commander Tim Lynn, a man with a military background (Exhibit 1, 23), described the RFLL medical facilities as being, "similar to a M.A.S.H. [Mobile Army Surgical Hospital] unit" (transcript 14, 11-14). Lynn also described waste management facilities (transcript 9, 24-25), centralized kitchens, irrigation and water purification systems, and hand-washing stations (transcript 13, 18-22). Rob Savoye, a longtime RFLL participant (transcript 63, 2) and professional trail maintenance supervisor testified to his own participation in trail removal and his experience with the extent of trash removal (transcript 66, 13-20). Altogether, these statements address every one of the allegations raised by the government in its Answer Brief. Furthermore, Savoye

entered testimony which challenges the validity of the allegations of damage altogether (transcript 63, 19-21; 64, 16-25; and 65, 1-5).

The government agrees that the RFLL "has generally encouraged respectful use of natural resources and proper sanitation procedures" (Answer Br. 25) and a large amount of evidence and testimony was introduced at trial to substantiate this claim.

Finally, it should be noted that under RFRA, it is not enough to prove that an activity or group poses a threat to compelling government interests, but that the rule in question addresses the threat(s) posed. Yet, at two out of three permitted annual Gatherings, land use and resource damage risks occurred (transcript 41, 22-25 and 42, 1-14).

To summarize, the government has alleged damages and unacceptable risks during six of the nineteen annual Gatherings managed using a law-enforcement strategy, and during zero out of fifteen annual Gatherings managed exclusively using a resource strategy that is less restrictive to religious practices. Of these alleged damages, none are definitively linked to the RFLL, and none are even reasonably linked to the Defendant. Furthermore, allegations of damages during four of the six problem years (the four alleged to occur before modern permit regulations were in place) should properly be disregarded by the court in order to protect the Due Process rights of the defendant. The Appellant asserts that the evidence provided by the government is insufficient to serve as a case by case, contextual determination that RFLL annual Gatherings threaten compelling government interests in such a manner that burdens on free exercise of religion may be justified. Nor is a case by case contextual determination that this specific defendant's use and occupancy of Forest Service lands endangers said interests even reasonably entertained.

### 6. Alleged Harms of Granting a Religious Use Exception

Though the government admits that a "a general interest in uniformity is a slippery slope argument that cannot justify a substantial burden," and that, "a general interest in uniformity is itself insufficient as a compelling interest," (Answer Br. 22), it persists in asserting that providing a religious use exception to this specific defendant or to the RFLL would cause administrative harm due to a lack of uniformity. Their sole argument in support of this assertion, excepting the statements refuted during the previous section of this Reply Brief, is that, unlike the Controlled Substances act challenged in *UDV*, no prior exception to the USFS group-use regulations exists.

Appellant does not think the explicit prior recognition of an exception to the Controlled Substances Act was dispositive in *UDV*, but nonetheless the government's argument that "In contrast here, no exceptions are allowed for" (Answer Br. 28) is not consistent with the plain language of the regulation. Contrary to the government's assertions, 36 C.F.R. § 251.54 (g)(3)(iii) explicitly requires the USFS to offer an available alternative manner of regulation if any of the eight generally applicable criteria requiring issuance of a non-commercial group use permit are not met. Despite the Forest Service's prior knowledge of the RFLL custom to not delegate representative authority (Transcript 30, 6-9; Exhibit G), and requests for an alternative method (Exhibit G), it has persistently refused to offer a less burdensome manner of regulation by refusing to issue a permit for rainbow gatherings in a manner that would not impose a substantial burden to a central religious tenet.

It is unclear how offering a religious use exception to a group would cause administrative harm when the language for such an exception is clearly contained in the statute at question.

Additionally, exception to the ticketing and subsequent prosecution of attendees was clearly allowed. Though thousands of attendees were present at the 2006 annual gathering of the RFLL (Transcript 18, 9-17), violation notices were only issued in the hundreds (docket). Mr. Lynn, the ICT commander, explained that law enforcement officers were given leeway to, "make their own determination on who gets a ticket" (Transcript 39, 23-24) and agreed that officers had leeway to "ticket one person in a car and not everybody else in the car" or "one person in a crowd and not anybody else in a crowd" (Transcript 40, 8-14). Mr. Lynn could not describe any guidelines offered to his officers that would have assisted them in determining, between individuals attending the same illegal event, whom to ticket and whom to except from ticketing (Transcript 39, 25 through 40, 1-7). Yet exceptions plainly were granted (Transcript 50, 12-17).

It is unclear how it would cause administrative harm to offer guidelines to law enforcement officers that would assist them in determining which participants are present to engage in religious practices and to grant these heretofore off-the-cuff exceptions to those individuals. Appellant asserts that no administrative harm would be caused by granting either of the above-mentioned manners of exception, and that the government's position amounts to no more than the slippery slope argument for general uniformity decried in *UDV*.

### 7. The Existence of Less Restrictive, Alternative means

From the above, it is clear that no compelling government interest is actually met by the current permit application process and enforcement procedures. In case the court should deem that such an interest is served, the government is burdened to prove that the current processes and enforcement methods are the least restrictive means. In its answer

brief, the government properly summarizes the delineation of burdens and responsibilities in this matter (Answer Br. 31-33).

The Appellate does not challenge that the regulations in question are, on their face, narrowly tailored to meet certain government interests. Burdens imposed upon free exercise of religion by these rules of general applicability are facially incidental, which is why a RFRA defense, as opposed to a simple constitutional challenge, has been undertaken here.

As to the second point of the government's required argument, "a demonstration that the government 'considered and rejected the efficacy of less restrictive means before adopting the challenged practice'" (Answer Br. 32), no evidence or testimony has been entered into the record. The single assertion claiming that this has occurred (Answer Br. 34) is made without supporting facts or cites to evidence. Considering the history of the USFS introducing regulations generally aimed at preventing RFLL religious practices from occurring, it may be more appropriate to claim that the government did consider alternative forms, but rejected them because they allowed RFLL gatherings to continue. In two previous instances where regulations effectively made RFLL practices illegal, it was the courts, not the USFS, that rejected the regulations (Transcript 69, 4-16; Exhibit A).

Notwithstanding the fact that the government plainly fails to meet its burden here, Appellant did offer several suggestions of alternative methods for satisfying government interests.

The government claims that "the resource management strategy that the Defendant suggests has decidedly not been successful in the past" (Answer Br. 34-35) but all

evidence points to the contrary, since all damages were alleged to occur during years when group-use regulations were in place and law enforcement strategies were therefore used (Answer Br. 26-27), while none occurred during years prior to 1984, when resource management strategies were used exclusively by the USFS. The government further claims that such an alternative method would not properly function because, "Defendant does not specifically describe how his vision of mutual operating plans would function," (Answer Br. 35) but such description is unnecessary, because mutual operating plans have functioned in the past (Transcript 64, 9 through 65, 5) and the historical record may be consulted for the specifics of implementation.

To further advance the Appellant's claim that mutual operating plans have and would continue to meet the government's needs, the existence of clean-up letters, documents issued by the USFS to attest to the success of such plans, were brought up at trial (*Ibid.*). It is regrettable that more time was not granted for the preparation of this case, so that the Appellant could have produced the full text of these documents to the court.

The government decries the issuance of separate camping permits as a viable alternative means because "it would remove the Forest Service's ability to regulate the group activity" (Answer Br. 35) but fail to show how such an alternative, granted as an exception to religious users, would do so. The issuance of smaller group permits was successfully undertaken to address fire danger in 2006.

The government asserts that eliminating the signature requirement is inadequate because "If no group representative is designated, the Forest Service has no point [of] contact for the group and is hampered in its ability to address issues raised by the use, especially in the case of an emergency" (Answer Br. 36). This claim is completely

contrary to the facts of the case. At trial, the prosecution made much noise about the organizational structure of RFLL. Documents were introduced containing a description of Info (Exhibit 1, 10), a publicly available group of volunteers that see to the dissemination of information throughout the gathering. Such would serve as a viable point of contact. Additionally, at trial, the ICT commander described a RFLL electronic communication network (Transcript 13, 23-24) that, since Mr. Lynn knew the content of the communications (Transcript 13, 24 through 14, 3), it can be assumed that the USFS was able to monitor. Thus it is demonstrated that the USFS has the capability to transmit over said network, providing a conduit of emergency communication, not just to a single point of contact, but to the vast majority of gathering participants.

The government also claims that eliminating the signature requirement is inadequate because an unsigned permit "is not given legal effect" (Answer Br. 36). Appellant already addressed this legal fiction (Opening Br. 18), pointing out that a signature entered on a group's behalf, by an unauthorized agent, is a fraudulent signature and has no legal effect.

In summary, the government falls short of meeting its burden to show that there are no alternative means of meeting compelling interests less restrictive to religious freedom than those currently used. Notwithstanding, Appellant introduced three examples of less restrictive means, and asserts that more examples are likely available. Of those suggested by the Appellant, one has been employed before, in this exact circumstance (to protect resources and public safety during annual Gatherings of the RFLL) to great effect. The second suggested method was successfully applied at the 2006 Gathering. As to the third suggestion, the government is incapable of entering a reasonable argument against it.

Finally, it should be noted that the entirety of the government's arguments in this area address alternative means for the permit regulations themselves. The Defendant was not charged with failure to apply for a permit but, rather, for simple use and occupancy. The government makes absolutely no attempt to show that the enforcement of use and occupancy laws was narrowly tailored to meet compelling interests, or that steps were taken to consider and reject alternate means of enforcement less restrictive to this Defendant's religious liberty.

### 8. Summation and Conclusions

Your honor, it is regrettable that so much of the court's valuable time has been wasted exploring, in depth, a matter that is both simple and straightforward. The facts in this case are clear. Every year since 1972, thousands of worshippers have made religious pilgrimage to pray together on National Forest lands; the Defendant and his family are among those worshippers. Since 1984, the USFS has worked to put and end to these National Gatherings. They have done so in spite of court rulings, in spite of the Constitution and our guarantee of religious liberty, and in spite of our many cries for compassionate stewardship of the land.

This year, the USFS ICT commander declared our activities to be illegal and did everything in his power to stop the RFLL from gathering together to pray. In doing so, he created an environment of fear inhospitable to the notion of prayer, as well as causing this Defendant and others to be absent from religious activities. If the RFLL had not risen up in protest, Mr. Lynn and his band would have been successful in keeping an estimated 15,000 from engaging in the practice of their religion altogether.

On July 1, 2006, this Defendant was ticketed and given less than sixteen hours to appear in court, at which initial appearance he was granted only five days to prepare a

defense. Had he been given more time, the evidence entered on his behalf would have been irrefutable. As it stands, that which is before the court is a hurried and incomplete case, yet it shows the facts clearly enough that the prosecution, employing various levels of legal subterfuge—including blatantly false statements, unsubstantiated rhetoric, the tardy introduction of data, and a curiously error-ridden transcript—cannot mount a reasonable argument against it.

Considering the foregoing—that the Appellant clearly demonstrates substantial burden of religious practices uncontested as sincerely held, and that the Appellee falls short of proving either that the questioned regulations and enforcement methods further a compelling government interest or that they are the least restrictive means of doing so—it is plain that there is only one applicable outcome to this *de novo* review.

The Appellant asks that the court overturn the Magistrate's ruling of guilty in this matter, so that justice may be served.

Dated: 02/05/07

Scott Sowka (pro se)
1200 W. Elm St. ~ Fort Collins, CO 80521
(503) 984-6841 ~ madpoet418@yahoo.com

x Scott S

(Rev. 04/15/02)